# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

RAUL MESA OSCAR-TORRES, a/k/a
Raul Pelaes Gonzalez, a/k/a Raul
Torres Meza,
        *Defendant-Appellant.*

No. 06-5074

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, Senior District Judge.
(5:05-cr-00224-H-ALL)

Argued: September 28, 2007

Decided: November 8, 2007

Before MOTZ, Circuit Judge, HAMILTON, Senior Circuit Judge,
and Raymond A. JACKSON, United States District Judge for the
Eastern District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge Motz wrote the
opinion, in which Senior Judge Hamilton and Judge Jackson joined.

## COUNSEL

**ARGUED:** Eric Joseph Brignac, Research and Writing Attorney,
OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North
Carolina, for Appellant. Eric David Goulian, Assistant United States

Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, Stephen C. Gordon, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. George E. B. Holding, United States Attorney, Anne M. Hayes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

After arresting Raul Mesa Oscar-Torres without a warrant as part of a nationwide initiative to apprehend illegal alien gang members, law enforcement officers fingerprinted him and thus obtained his criminal and immigration records. The Government then charged him with one count of illegally reentering the United States following commission of a felony and deportation, in violation of 8 U.S.C.A. § 1326(a) and (b)(1) (West 2005 & Supp. 2007). Prior to trial, Oscar-Torres moved to suppress the fingerprint evidence and the records obtained through it as the "fruit" of his illegal arrest. The district court denied the motion, reasoning that this evidence constituted "identity" evidence and therefore could never be suppressed. Oscar-Torres conditionally pled guilty, reserving the right to appeal denial of his suppression motion. We reverse and remand for further proceedings.

I.

In July 2005, the Bureau of Immigration and Customs Enforcement (ICE) conducted a two-week, nationwide enforcement action as part of Operation Community Shield, an initiative targeting street gang members illegally present in the United States. Oscar-Torres's arrest occurred during the Operation Community Shield enforcement action in Raleigh, North Carolina.

On July 22, 2005, ICE agents and Raleigh police officers went to the Fox Ridge Manor apartment complex in Raleigh, the last known

address of a number of suspected gang members. Several teams of officers went to individual apartments seeking to arrest specific gang members. One team stationed itself at the only entrance to the complex and stopped all vehicles entering and leaving in order to question the occupants.

The officers stationed at the entrance stopped and questioned Oscar-Torres, among others. In response to their questions, he admitted to being an illegal alien and, at their request, lifted his shirt to display a tattoo that they believed signified gang membership. Without a warrant, the officers then arrested Oscar-Torres and transported him to ICE headquarters, where they fingerprinted, photographed, and interrogated him, failing to advise him of his *Miranda* rights until seven hours after his arrest. His statements during the interrogation and his fingerprints, obtained prior to any advisement of rights, led to the discovery of Oscar-Torres's criminal record and prior deportation.

The Government charged Oscar-Torres with violating 8 U.S.C.A. § 1326(a) and (b)(1). Oscar-Torres moved to suppress all evidence "regarding the discovery" of his "presence" in this country; the Government stipulated that it would not "use the statements made by the defendant as a result of the unlawful arrest as part of its case-in-chief," but contended that it should be permitted to use Oscar-Torres's fingerprints and the records obtained from them. Although the magistrate judge recommended that Oscar-Torres's warrantless arrest be found contrary to law, the judge nevertheless recommended that the fingerprints and records not be suppressed. The judge reasoned that they constituted evidence of Oscar-Torres's identity, and, the judge held, evidence of identity could never be suppressed, even if obtained through an illegal arrest. The district court, on *de novo* review, adopted the recommendation of the magistrate judge and denied the suppression motion.

On appeal, the Government concedes that the authorities stopped Oscar-Torres without "reasonable, particularized suspicion of illegal activity," let alone probable cause. *See* Brief for the United States at 13 & n.6. Moreover, the Government does not seek admission of Oscar-Torres's statements. Thus, we consider only Oscar-Torres's claim that the district court erred in denying his motion to suppress the fingerprint exemplar and records obtained from it. When faced

with a ruling on a suppression motion, we review conclusions of law *de novo* and underlying factual findings for clear error. *United States v. Jarrett*, 338 F.3d 339, 343-44 (4th Cir. 2003).

## II.

Indisputably, suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Courts will also suppress evidence that is the indirect product of the illegal police activity as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Of course, not all evidence that "would not have come to light but for the illegal actions of the police" is suppressible as fruit of the poisonous tree. *Id.* Rather, the critical inquiry is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (internal quotation marks omitted).

The Government's principal contention here is not that the fingerprint and related evidence escapes suppression because it was obtained by means "purged of the primary taint." Rather, the Government's chief claim is that the fingerprint exemplar and attendant records constitute evidence of identity which, according to the Government, can *never* be suppressed, even if obtained as the "fruit" of illegal police activity. In so arguing, the Government heavily relies on the following sentence from *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984):

> The "body" or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred.

The Government contends that this "identity statement" establishes the broad rule that evidence of a defendant's identity can never be suppressed. Oscar-Torres argues instead that the *Lopez-Mendoza* "identity statement" merely reaffirms the well-established proposition that illegal police activity does not preclude a court from exercising

personal jurisdiction over a defendant or serve as a basis for dismissing his prosecution.[1]

The meaning of the *Lopez-Mendoza* "identity statement" has bedeviled and divided our sister circuits.[2] *Compare United States v. Olivares-Rangel*, 458 F.3d 1104, 1106 (10th Cir. 2006) (interpreting *Lopez-Mendoza* as merely reiterating long-standing jurisdictional rule), *and United States v. Guevara-Martinez*, 262 F.3d 751, 754-55 (8th Cir. 2001) (same), *with United States v. Bowley*, 435 F.3d 426, 430-31 (3d Cir. 2006) (interpreting *Lopez-Mendoza* as barring suppression of evidence of identity), *United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005) (same), *and United States v. Roque-Villanueva*, 175 F.3d 345, 346 (5th Cir. 1999) (same). We now turn to this question.

## III.

Close examination of *Lopez-Mendoza* itself, as well as other Supreme Court precedent, persuades us that *Lopez-Mendoza* does not prohibit suppression of evidence of a defendant's identity. We reach this conclusion for several reasons.

First, all of the authority that the Supreme Court cites in support of its "identity statement" in *Lopez-Mendoza* addresses a court's jurisdiction over a defendant himself, *not* suppression of unlawfully obtained evidence relating to his identity. *See Lopez-Mendoza*, 468 U.S. at 1039-40 (citing *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) (reaffirming the "established rule that illegal arrest or detention does not void a subsequent conviction"); *Frisbie v. Collins*, 342 U.S. 519,

---

[1]Alternatively, Oscar-Torres contends that the district court erred in refusing to consider whether his unlawful detention constituted an egregious violation of the Fourth Amendment. Because we hold that the exclusionary rule does apply to fingerprints taken pursuant to an unlawful arrest, we need not consider whether egregious violations of the Fourth Amendment might warrant a suppression remedy where none otherwise exists. *See Lopez-Mendoza*, 468 U.S. at 1050-51.

[2]The Ninth Circuit does not even have a consistent view. *See, e.g.*, *United States v. Garcia-Beltran*, 389 F.3d 864, 868 (9th Cir. 2004); *United States v. Guzman-Bruno*, 27 F.3d 420, 422 (9th Cir. 1994).

522 (1952) ("[T]he power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'"); *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 158 (1923) ("Irregularities on the part of the Government official prior to, or in connection with, the arrest would not necessarily invalidate later proceedings in all respects conformable to law.")).

As Judge Ebel carefully explained for the Tenth Circuit in *Olivares-Rangel*, 458 F.3d at 1110, the Supreme Court's reliance on these cases in *Lopez-Mendoza* is telling. This reliance indicates that the Court's "identity statement" simply references "the long-standing rule, known as the *Ker-Frisbie* doctrine, that illegal police activity affects only the admissibility of evidence; it does not affect the jurisdiction of the trial court or otherwise serve as a basis for dismissing the prosecution." *Id.*[3]

The context of the *Lopez-Mendoza* "identity statement" also indicates that the Supreme Court intended only to restate an established jurisdictional rule. The *Lopez-Mendoza* Court considered two separate civil deportation hearings, involving two very different suppression claims. Lopez-Mendoza "objected only to the fact that he had been summoned to a deportation hearing following an unlawful arrest; he entered no objection to the evidence offered against him." 468 U.S. at 1040. The Supreme Court quickly rejected this claim, relying on its "identity statement." The Court reasoned that because "[t]he 'body' or identity of a defendant . . . is never itself suppressible as a fruit of an unlawful arrest," then "[t]he mere fact of an illegal arrest" provided Lopez-Mendoza with no basis for absenting *himself* from the hearing. *Id.* at 1039-40; *see also id.* at 1043 ("the person and identity of the respondent are not themselves suppressible").

In contrast, the other alien in that consolidated appeal, Sandoval-Sanchez, objected to *evidence* offered against him, including a state-

---

[3]Although the Government seeks to rely on *United States v. Arias*, 678 F.2d 1202 (4th Cir. 1982), there too we only applied this same jurisdictional rule, holding "the government is not prevented *from bringing a defendant to trial* merely because he was identified as a result of a false arrest." *Id.* at 1206 (emphasis added).

ment he made to an INS officer that he had entered the United States unlawfully. *Id.* at 1037. The Supreme Court considered this contention at length, deeming it "more substantial" than Lopez-Mendoza's contention and apparently not settled by the "identity statement." *Id.* at 1040. The Government posits that the Court engaged in this analysis because Sandoval-Sanchez did not seek to suppress "only" identity evidence. But if the Court's "identity statement" truly prohibited suppression of any evidence relating to identity, surely the Court would have considered which of Sandoval-Sanchez's statements were sufficiently identity-related to render them beyond the reach of the exclusionary rule and which were not. The Court's failure to conduct this analysis indicates that its "identity statement" simply set forth the well-established bar on suppression of the body of the defendant and the fact of his identity, and did not extend that bar to *evidence* related to identity.

The language used by the *Lopez-Mendoza* Court in rejecting Sandoval-Sanchez' contention supports this conclusion as well. Initially, the Court carefully and expressly reaffirmed, without any qualification, "[t]he general rule in a *criminal* proceeding" that *evidence* resulting from an unlawful arrest is suppressible. *Id.* at 1040-41 (emphasis added). The Court held that the exclusionary rule should not apply with equal force in *civil* administrative deportation hearings, solely because the high social costs and limited deterrent value of the exclusionary rule did not warrant its application in that context. *Id.* at 1042-47. Notably, in explaining this holding, the Court took care to indicate that the *evidence* that Sandoval-Sanchez sought to exclude, although not suppressible at a deportation proceeding, might well be suppressible in a criminal trial. *Id.* at 1042 ("[T]he prospect of losing evidence that might otherwise be used in a criminal prosecution undoubtedly supplies some residual deterrent to unlawful conduct by INS officials."); *id.* at 1047 ("When the crime in question involves unlawful presence in this country, the criminal may go free, but he should not go free within our borders."). This discussion would have no purpose if, as the Government contends, a court could never suppress identity-related evidence in criminal proceedings.

Finally, other Supreme Court precedent, both prior and subsequent to *Lopez-Mendoza*, offers definitive support for our interpretation of its "identity statement." Twice the Court has specifically held that in

some circumstances the exclusionary rule *requires* suppression of the very kind of identity evidence at issue here — fingerprint evidence. *See Hayes v. Florida*, 470 U.S. 811, 816 (1985) (holding fingerprints properly suppressed when defendant was arrested without probable cause, taken to police station without consent, and detained and fingerprinted for an investigative purpose); *Davis v. Mississippi*, 394 U.S. 721, 727 (1969) (same). These cases fatally undermine the Government's contention that *Lopez-Mendoza* bars suppression of all identity evidence in criminal proceedings.[4]

*Lopez-Mendoza* establishes that the exclusionary rule does not apply in civil deportation proceedings. Moreover, in accord with prior, *e.g. Frisbie*, 342 U.S. at 522, and subsequent, *e.g. Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 191 (2004), precedent, *Lopez-Mendoza* also upholds an important principle: a defendant must appear before the court as himself. Despite the illegality of his detention or arrest, he cannot suppress his person or the fact of his identity. But it is clear that *Lopez-Mendoza* does not prohibit suppression of identity-related *evidence* in *criminal proceedings*. The district court erred in refusing to suppress the fingerprint and attendant record evidence on that ground.

IV.

This victory, however, does not win the day for Oscar-Torres. His fingerprints and records are not automatically suppressible simply because they would not have been obtained *but for* illegal police activity. Rather, this evidence is suppressible only if obtained by "*ex-*

---

[4]The Government makes the exceedingly unlikely suggestion that *Hayes* and *Davis* simply "carve out a limited exception" to their asserted "*Lopez-Mendoza* rule," *i.e.*, that a court cannot suppress any identity evidence. But the Supreme Court, which decided *Hayes* just eight months after *Lopez-Mendoza*, nowhere stated that *Hayes* constituted an exception to this asserted "rule," or even mentioned *Lopez-Mendoza* in its *Hayes* opinion. *See* 470 U.S. 811. Similarly, the Government's brief in *Hayes* does not cite *Lopez-Mendoza*, let alone attempt to assert as a "rule" that fingerprint evidence must be admitted as identity evidence and that suppression would be an "exception." *See* Brief of Respondent, Hayes v. Florida, 470 U.S. 811 (1985) (No. 83-6766).

*ploitation*" of the initial police illegality. *Wong Sun*, 371 U.S. at 488 (emphasis added).

*Hayes* and *Davis* illustrate situations in which law enforcement authorities obtained fingerprint evidence by "exploitation" of the initial police illegal activity. In both cases, the police, without probable cause, detained and then fingerprinted a person they suspected had committed a certain crime, and in both cases the police acted with a clear investigative purpose — to tie the fingerprinted suspect to that crime. The Supreme Court held in *Davis*, and reaffirmed in *Hayes*, that the police may not forcibly transport an individual to a police station and detain him to obtain his fingerprints for such "investigative" purposes without probable cause. *See Hayes*, 470 U.S. at 815; *Davis*, 394 U.S. at 727. In each case, however, the Court took care to acknowledge that its holding did not require suppression of fingerprint evidence obtained after a detention without probable cause in all circumstances. *See Davis*, 394 U.S. at 728 (suggesting that the Fourth Amendment might permit detention and fingerprinting of a suspect without probable cause if investigators adopted appropriately circumscribed procedures); *Hayes*, 470 U.S. at 816-17 (same).

Our sister circuits, when confronted with cases involving § 1326 offenses, like the one at hand, have read *Hayes* and *Davis* to permit a sensible rule as to when fingerprints will constitute fruit of an unlawful arrest, and so be inadmissible. When police officers use an illegal arrest as an investigatory device in a criminal case "for the purpose of obtaining fingerprints without a warrant or probable cause," then the fingerprints are inadmissible under the exclusionary rule as "fruit of the illegal detention." *Olivares-Rangel*, 458 F.3d at 1114-16 (citing *Hayes*, 470 U.S. at 817-18, and *Davis*, 394 U.S. at 727-28); *see also United States v. Garcia-Beltran*, 389 F.3d 864, 868 (9th Cir. 2004), *Guevara-Martinez*, 262 F.3d at 756. But when fingerprints are "administratively taken . . . for the purpose of simply ascertaining . . . the identity" or immigration status of the person arrested, they are "sufficiently unrelated to the unlawful arrest that they are not suppressible." *Olivares-Rangel*, 458 F.3d at 1112-13. Thus, fingerprints do not constitute suppressible fruit of an unlawful arrest or detention unless the unlawful arrest "was purposefully exploited in order to develop critical evidence of criminal conduct to be used against [the d]efendant" in a criminal proceeding. *Id.* at 1113.

We recognize that *Hayes* and *Davis* themselves do not articulate this rule. But in both cases the Supreme Court based its holding — requiring suppression of the fingerprint evidence — on the undisputed fact that the police obtained the challenged fingerprints during investigation of a specific crime, and through an "investigative detention" for "investigative purposes" related to that crime. *Hayes*, 470 U.S. at 814-16; *Davis*, 394 U.S. at 726. This emphasis on the criminal context in which the fingerprints were obtained, and the intended investigative purpose for which they were procured, at least suggests that fingerprints obtained for *administrative* purposes, and intended for use in an *administrative* process — like deportation — may escape suppression.

Such a deportation case would seem to differ markedly from *Hayes* and *Davis*. If prior to fingerprinting an alien has admitted to his unlawful presence in this country (as Oscar-Torres did here), then the Government may have no need or desire to investigate him for criminal activity, and the Government might simply take his fingerprints as part of the routine procedure to process him administratively for deportation. In contrast, the police suspected Hayes and Davis of criminal activity, and detained and fingerprinted them for the clear investigatory purpose of connecting them to specific crimes. *Hayes*, 470 U.S. at 812; *Davis*, 394 U.S. at 722-23. Fingerprinting conducted as part of an arrest intended to lead only to an administrative deportation simply does not present the same concerns as the fingerprinting at issue in *Hayes* and *Davis*, which was meant to (and did in fact) lead to criminal prosecutions. *Hayes*, 470 U.S. at 813; *Davis*, 394 U.S. at 723.

Indeed, the Supreme Court's holding that fingerprint evidence need not be excluded in administrative deportation hearings, *see Lopez-Mendoza*, 468 U.S. at 1051, seems almost to require this distinction. If illegally obtained evidence that law enforcement officers intend to use in civil deportation hearings cannot be suppressed because exclusion will not effectively deter unlawful arrests, as *Lopez-Mendoza* holds, 468 U.S. at 1042-46, then suppressing that evidence in an unanticipated and unforeseen criminal prosecution surely cannot provide any additional *ex ante* deterrence. Of course, as the Court assumed in *Lopez-Mendoza*, when law enforcement officers "intend[ ] or expect[ ]" that an arrest will lead to a criminal prosecution as well

as (or instead of) a deportation proceeding, then the "exclusionary rule . . . continue[s] to apply" and the fingerprints must be suppressed. 468 U.S. at 1042-43.

Accordingly, we adopt the rule articulated by our sister circuits. We note that when applying this rule, a court must focus on the "purpose" for the illegal arrest and fingerprinting, as the Supreme Court did in *Hayes* and *Davis*. *See, e.g.*, *Davis*, 394 U.S. at 727 (holding that "[d]etentions for the sole purpose of obtaining fingerprints" in a criminal investigation are "subject to the constraints of the Fourth Amendment"). Thus, an alien's fingerprints taken as part of routine booking procedures but intended to provide evidence for a criminal prosecution are still *motivated* by an investigative, rather than an administrative, purpose. Such fingerprints are, accordingly, subject to exclusion. *See Olivares-Rangel*, 458 F.3d at 1114.

In the case at hand, the district court found that Oscar-Torres could not suppress the fingerprint exemplar and records obtained from it because "the identity of the defendant is never suppressible," and so the court did not determine whether an investigative or administrative purpose motivated law enforcement officers in obtaining this evidence.[5] The record provides no clear answer to this question. It is undisputed that the Government detained Oscar-Torres as part of a nationwide dragnet to capture illegal alien gang members. An immigration agent who led this effort (accompanied by local law enforcement officers) acknowledged that he "targeted" Oscar-Torres not because he was an illegal alien, but because he was an illegal alien gang member. This admission suggests that a criminal investigation and planned criminal prosecution may have motivated the detention and fingerprinting. But other evidence in the record supports a finding that an administrative purpose provided the motive. For example, immigration agents testified that they arrested Oscar-Torres simply to deport him, that they fingerprinted him as part of the "normal processing for an alien," and that authorities only contemplated a criminal prosecution when the

---

[5]The record belies the Government's contrary contention. The district court stated that it found the factual dispute over the purpose of the fingerprinting to be "irrelevant to the outcome of the suppression motion" because fingerprints constitute identity evidence, which, the court (erroneously) held, is never suppressible. *See* J.A. 183.

fingerprints led to the record of Oscar-Torres's prior felony and deportation.

We remand for the district court to determine whether, in obtaining the fingerprints (and attendant records), law enforcement officers were motivated by an investigative purpose; if so, they obtained this evidence by "exploitation of [police] illegality," and it must be suppressed. *Wong Sun*, 371 U.S. at 488. But if on remand the court determines that this evidence was obtained for and motivated by an administrative purpose, the evidence may be admitted. We recognize that the court may conclude that both investigative and administrative purposes motivated the illegal arrest and fingerprinting, in which case the fingerprint and attendant record evidence must be suppressed.

V.

For the foregoing reasons, the judgment of the district court is

*REVERSED AND REMANDED.*