**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 27, 2013

Lyle W. Cayce
Clerk

No. 12-30793

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JOSE LUZ HERNANDEZ-MANDUJANO,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Louisiana

Before REAVLEY, JOLLY, and SMITH, Circuit Judges.

PER CURIAM:

Jose Hernandez-Mandujano ("Hernandez") was indicted for and pled guilty to unlawful re-entry[1] after two U.S. Border Patrol Agents stopped him as he was driving eastbound at Mile Marker 15 on Interstate 10 near Lake Charles, Louisiana. Hernandez argued before the district court that all evidence deriving from this stop should be suppressed because the agents lacked reasonable suspicion at the time of the stop. The district court disagreed and denied Hernandez's motion to suppress. Although we conclude that the agents lacked reasonable suspicion, and clearly violated the Fourth Amendment in stopping

---

[1] 28 U.S.C. § 1326(a) and (b)(2).

No. 12-30793

Hernandez, we AFFIRM the judgment of the district court because "neither [Herandez's] identity nor his INS file are [*sic*] suppressible." *United States v. Roque-Villanueva*, 175 F.3d 345, 346 (5th Cir. 1999).

I.

On April 18, 2011, shortly after 10:00 a.m., U.S. Border Patrol Agents Brett Sullivan and Jeremy Taylor stopped Hernandez as he was driving eastbound on Interstate 10 near Lake Charles, Louisiana, approximately 450 miles from the nearest United States-Mexico border crossing. When Hernandez first drove past the agents, they noticed his hands were "locked" on the steering wheel of his white Ford Explorer SUV; his grip was tight and his arms were straight out, and he allegedly did not display the relaxed nature of most drivers. Because the agents believed Hernandez was exhibiting nervous behavior, they began to follow him. As they followed, they noticed Hernandez's speed dropped from around 70 miles per hour (the posted speed limit) to about 60 miles per hour. Furthermore, when the agents were behind Hernandez, they noticed him talking to the person in the passenger's seat, but when they pulled alongside Hernandez, the conversation ceased—only to resume again when the agents dropped back.

The agents additionally noticed the car had a Tinkerbell steering wheel cover and, upon checking the vehicle's license plates, learned the car was registered to a woman, but was not reported stolen, had no outstanding warrants or criminal activity associated with it, and had not recently crossed the border. Nonetheless, after following Hernandez for approximately five miles, the agents felt convinced Hernandez was transporting illegal aliens and pulled him over. The agents then learned from their questions Hernandez's name, that he is a Mexican national, and that he was present in the United States illegally.

Thus, based on this stop, Hernandez was charged with one count of re-entry without permission by an alien deported after conviction for an aggravated

No. 12-30793

felony, in violation of 28 U.S.C. § 1326(a) and (b)(2).  Hernandez filed a motion to suppress all evidence deriving from the warrantless stop, arguing it did not comport with the definition of an "extended border search" and that the agents lacked reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968).  After holding an evidentiary hearing, the district court agreed the stop was not an extended border search, but denied Hernandez's motion to suppress because it found the agents had a reasonable suspicion of illegal activity.

Hernandez then pled guilty, specifically preserving his right to appeal the district court's ruling regarding the motion to suppress.  He was sentenced to 33 months of imprisonment and three years of supervised release, and was ordered to pay a $100 special assessment.  He timely appealed.

II.

In this appeal, we must address whether the agents violated the Fourth Amendment in stopping Hernandez, and, if so, whether we may grant Hernandez's motion to suppress.

A.

The first question we consider is whether the agents had reasonable suspicion of illegal activity when they stopped Hernandez.  In resolving this question, we review the district court's factual findings for clear error and its legal conclusions *de novo*.  *United States v. Soto*, 649 F.3d 406, 409 (5th Cir. 2011).

When conducting roving patrols, border patrol agents may temporarily stop a vehicle "only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle's occupant is engaged in criminal activity." *Id.* (quoting *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001)).  The Supreme Court in *Brignoni-Ponce* articulated several factors for "deciding whether there is reasonable suspicion to stop a car in the border area." *United States v. Brignoni-Ponce*, 422

U.S. 873, 884 (1975). While we have not yet determined whether a "border area" has specific geographical limits, we need not make this determination today, as the stop in question fails under both the specific *Brignoni-Ponce* and the more general *Terry* inquiries. The *Brignoni-Ponce* factors include (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) the agents' experience in detecting illegal activity; (5) the driver's behavior; (6) particular aspects or characteristics of the vehicle; (7) information regarding recent border crossings or narcotics transportation in the area; and (8) the number of passengers and their appearance and behavior. *United States v. Moreno-Chaparro*, 180 F.3d 629, 631-32 (5th Cir. 1998).

The government relies primarily upon the following in arguing that Hernandez's motion to suppress was properly denied: (1) the agents' experience; (2) Hernandez's behavior; (3) the nature of the car; and (4) the passenger's behavior. Considering the totality of the circumstances, however, we find this evidence unpersuasive.

This Court's decision in *United States v. Moreno-Chaparro* is particularly instructive in analyzing the case now before us. In *Moreno-Chaparro*, officers stopped Moreno after he drove past a temporarily closed immigration checkpoint in a black Chevrolet pickup truck. As he passed the checkpoint, Moreno "slowed and appeared surprised to see the patrol car alongside the checkpoint," but did not make eye contact with the agent. *Id.* at 631. The agent ran a license check and learned the car was registered to a woman in El Paso, Texas. *Id.* He then stopped Moreno and proceeded to question him and investigate the vehicle. *Id.*

The court first found the agent lacked reasonable grounds to believe Moreno had come from the border, as the stop occurred 60 miles north of the Mexican border. *Id.* at 632. It went on to note that, generally, whether a driver looks at an officer should be accorded little weight, because to find otherwise "would put the officers in a classic 'heads I win, tails you lose' position." *Id.*

No. 12-30793

(quoting *United States v. Escamilla*, 650 F.2d 1229, 1233 (5th Cir. 1977)). Similarly, the court found the fact that the car Moreno was driving was registered to a woman was unavailing, because it was "obvious . . . that it is not unusual for a man to drive a vehicle registered to a woman." *Id.*

Moreover, the court declined to conclude the agent had reasonable suspicion because Moreno was driving a Chevy. The court stated that although "the Border Patrol carefully watches 'Chevys in general,' it would be manifestly unreasonable to target every Chevrolet pickup truck driven on Texas highways." *Id.* Indeed, the court ultimately found the vehicle was "just an average pickup truck," noting the "agent could not point to *anything* suspicious about [it]. . . . It contained no visible passengers, it had not been modified in an obvious way, and it was not riding low to the ground as if it were loaded down with people or contraband; it was neither particularly clean nor particularly dirty." *Id.* at 632-33 (emphasis in original).

Here, the stop occurred 450 miles from the nearest international border crossing and, plainly, there are no reasonable grounds for assuming Hernandez had come from the border. *See id.* at 632. Although this factor alone is not controlling, it is vital, *id.*, and, in its absence, "we examine the remaining factors charily." *United States v. Rico-Soto*, 690 F.3d 376, 380 (5th Cir. 2012) (citing *United States v. Olivares-Pacheco*, 633 F.3d 399, 402 (5th Cir. 2011)).

Hernandez was stopped on Interstate 10, which is a major corridor for illegal alien-smuggling between cities in Texas, such as Houston, and the East Coast. *Rico-Soto*, 690 F.3d at 379. Agent Sullivan was a senior agent with 16 total years of experience, including four years in the Lake Charles area. These two factors, however, are the only ones that may weigh in favor of the stop; considered along with the remaining factors, the evidence fails to satisfy the agents' claim to reasonable suspicion. First, the agents contend Hernandez's driving posture was highly suspicious and indicated nervousness, because he

5

had both hands on the steering wheel and was staring straight ahead rather than adopting a relaxed posture and talking on his cell phone, as many other drivers do. We will not say that a driver who has both hands on the wheel and is focusing on the road ahead of him—which is the ideal driving position—is acting in a manner indicative of criminal activity in a case such as this. Indeed, it is counterintuitive to condone the notion that drivers are less likely to be stopped if they are talking on the phone and driving with one hand—or no hands—on the wheel than they are if they engage in safe driving practices.

Next, that Hernandez's speed slowed considerably upon passing the border patrol agents is unpersuasive in this case. "This is the reaction of any cautious driver and due little weight." *United States v. Samaguey*, 180 F.3d 195, 198-99 (5th Cir. 1999). While continuing to drive below the speed limit may, combined with other circumstances, contribute to reasonable suspicion, the requisite circumstances are lacking here. *See id.* (finding the fact that Samaguey continued to drive under the speed limit contributed to reasonable suspicion when agents stopped him at 5:45 a.m. about 20 miles from the border, at a time and on a road known for smuggling of illegal aliens and drugs); *United States v. Villalobos*, 161 F.3d 285, 289-92 (5th Cir. 1998) (holding deceleration "may be one factor contributing to the reasonable suspicion justifying a stop such as this one," when Villalobos was stopped 59 miles north of the Mexican border after 2:20 a.m. on a route known for alien and drug trafficking (especially late at night), and the agents had a tip the car was likely smuggling drugs and observed the car driving in the lead car-load car arrangement). Thus, in this case we cannot find Hernandez's speed change contributed to reasonable suspicion.

Further unavailing is the agents' argument that Hernandez's driving of a vehicle registered to a woman supports reasonable suspicion. First, we have previously noted "the obvious, i.e., that it is not unusual for a man to drive a vehicle registered to a woman." *Moreno-Chaparro*, 180 F.3d at 632. This vehicle

6

was not reported stolen, had no outstanding warrants or criminal activity associated with it, and had not recently been documented as crossing the border. Thus, that Hernandez was not the registered owner of the car is not, here, a contributing factor.

Moreover, the type of vehicle Hernandez was driving was not suspect. Although Agent Sullivan testified that smugglers frequently use SUVs like the Ford Explorer, "it would be manifestly unreasonable to target every" SUV driving on highways between Texas and the East Coast. *See Moreno- Chaparro*, 180 F.3d at 632-33. Agents Sullivan and Taylor identified nothing suspicious about this particular SUV—that is, they noted no aspects of the SUV that rendered it any more likely than other SUVs to be transporting illegal aliens. *See Rico-Soto*, 690 F.3d at 381. Indeed, it was only an average SUV on a Louisiana highway. *See Moreno-Chaparro*, 180 F.3d at 633.

Finally, the agents noticed only one passenger, seated in the front passenger's side seat, who did not make eye contact with the agents and whose conversation with Hernandez stopped when the agents pulled alongside Hernandez, but resumed when the agents dropped back. This observation does not measurably contribute to reasonable suspicion in the absence of any other compelling evidence. We have previously held that "in the ordinary case, whether a driver looks at an officer or fails to look at an officer, taken alone or in combination with other factors, should be accorded little weight." *Id.* at 632. Similarly, conversations are subject to natural variation, waxing and waning at irregular intervals. If there were other strong indicators of reasonable suspicion, this factor may help contribute, but it is necessarily a weak factor and of especially light weight in a case such as this.

No. 12-30793

B.

Although we have found the agents clearly violated the Fourth Amendment in stopping Hernandez, our inquiry does not end here, for we must further ask whether we may grant his motion to dismiss. We note that we may affirm the district court's denial of a motion to suppress on any basis established in the record. *United States v. Aguirre*, 664 F.3d 606, 610 (5th Cir. 2011), *cert. denied* 132 S. Ct. 1949 (2012). When the agents illegally stopped Hernandez, he admitted that he was a Mexican citizen unlawfully present in the United States. This evidence led to and is the basis of Hernandez's conviction and 33-month incarceration. This evidence is also what Hernandez now seeks to suppress.

This Court, however, has previously held that an alien's INS file and even his identity itself are not suppressible. *Roque-Villanueva*, 175 F.3d at 346. In *Roque-Villanueva*, federal authorities learned of a deported alien's unlawful reentry after an allegedly unconstitutional stop. *Id.* In reviewing the alien's motion to suppress all evidence derived from the stop, this Court concluded neither his identity nor his INS file could be suppressed and affirmed the district court's denial of the defendant's motion. *Id.* Accordingly, we are bound by precedent and affirm the denial of Hernandez's motion to suppress. The judgment of the district court is, therefore,

AFFIRMED.

8

No. 12-30793

E. GRADY JOLLY, Circuit Judge, Specially Concurring.

While the majority's affirmance is correct given our binding precedent, I respectfully submit that this precedent is based on a misapplication of the Supreme Court's holding in *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984). In *Roque-Villanueva*, this Court summarily concluded that no evidence pertaining to an illegal alien's identity is suppressible, predicating this finding upon a statement by the Supreme Court in *Lopez-Mendoza* that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *Roque-Villanueva*, 175 F.3d at 346 (quoting *Lopez-Mendoza*, 468 U.S. at 1039).

In the time since we decided *Roque-Villanueva*, however, other circuits have attempted to answer the question of whether an alien's identity may ever be suppressible, and have come to conflicting conclusions as to the proposition for which *Lopez-Mendoza* truly stands. Indeed, the Fourth Circuit recently noted that "[t]he meaning of the *Lopez-Mendoza* 'identity statement' has bedeviled and divided our sister circuits."[1] *United States v. Oscar-Torres*, 507 F.3d 224, 228 (4th Cir. 2007). The issue dividing the circuits is whether the *Lopez-Mendoza* statement simply recognizes an established jurisdictional rule, i.e., that an unlawful arrest does not deprive a court of jurisdiction over the arrestee, or, instead, whether the statement establishes a blanket rule that a defendant's identity—and any evidence related to that identity—is never suppressible. *Compare Oscar-Torres*, 507 F.3d at 228-29 (interpreting *Lopez-Mendoza* as merely reiterating long-standing jurisdictional rule), *and United States v. Olivares-Rangel*, 458 F.3d 1104, 1106 (10th Cir. 2006) (same), *and*

---

[1] That court further noted the Ninth Circuit's view does not even appear consistent. 507 F.3d at 228 n.2 (citing *United States v. Garcia-Beltran*, 389 F.3d 864, 868 (9th Cir. 2004); *United States v. Guzman-Bruno*, 27 F.3d 420, 422 (9th Cir. 1994)).

No. 12-30793

*United States v. Guevara-Martinez*, 262 F.3d 751, 754-55 (8th Cir. 2001) (same), *with United States v. Bowley*, 435 F.3d 426, 430-31 (3d Cir. 2006) (interpreting *Lopez-Mendoza* as barring suppression of evidence of identity), *United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005) (same), *and Roque-Villanueva*, 175 F.3d 346 (same). This is an issue with which this court has never truly grappled, notwithstanding our precedential holdings.

## I.

To explain the circuit split, it is useful first to consider the facts of *Lopez-Mendoza* itself. This case involved two defendants, Adan Lopez-Mendoza and Elias Sandoval-Sanchez. 468 U.S. at 1034. Lopez-Mendoza was arrested in 1976 by INS agents at his place of employment, a transmission repair shop in San Mateo, California. 468 U.S. at 1035. The INS agents arrived in response to a tip; they had not sought a warrant, and the shop's proprietor refused to permit them to interview his employees during work hours. *Id.* One agent nevertheless approached Lopez-Mendoza, who, in response to the agent's questions, gave his name and indicated he was from Mexico and had no close family ties in the United States. *Id.* The agent arrested Lopez-Mendoza, and after further questioning, Lopez-Mendoza admitted he was born in Mexico, was still a Mexican citizen, and had entered the U.S. without inspection by immigration authorities. *Id.* The agents then prepared a "Record of Deportable Alien" (Form I-213) and an affidavit Lopez-Mendoza executed that admitted his Mexican nationality and his illegal entry. *Id.*

Later, at a deportation hearing before an immigration judge, Lopez-Mendoza's counsel moved to terminate the proceeding on the ground that Lopez-Mendoza had been unlawfully arrested. *Id.* The judge, however, ruled the lawfulness of Lopez-Mendoza's arrest was irrelevant to his deportation. *Id.* On appeal, the BIA similarly found "[t]he mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding," and, furthermore, found

Lopez-Mendoza had not objected to the admission of evidence in the Form I-213 or his affidavit. *Id.* at 1036. The Ninth Circuit, sitting *en banc*, vacated Lopez-Mendoza's deportation order and remanded for a determination as to whether Lopez-Mendoza's Fourth Amendment rights had been violated when he was arrested. *Id.*

Finally, the case reached the Supreme Court. It conducted a brief analysis of Lopez-Mendoza's claim, which began with the "identity statement," i.e., "[t]he 'body or identity of a defendant or respondent in a criminal or civil proceeding is never **itself** suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *Id.* (emphasis added). The Court noted that, on that basis alone, Lopez-Mendoza's claim failed. *Id.* at 1040. It further found that "Lopez-Mendoza objected only to the fact that he had been summoned to a deportation hearing following an unlawful arrest; he entered no objection to the evidence offered against him." *Id.* Reasoning the mere existence of an unlawful arrest has no implications in a later deportation proceeding, the Court reversed the Ninth Circuit's judgment. *Id.*

Sandoval-Sanchez, the defendant in the companion case to Lopez-Mendoza, was similarly questioned and arrested by INS workers at his place of employment, and later admitted he had unlawfully entered the United States. He argued that he made the admission because he was unaware he had a right to remain silent. *Id.* at 1036-37. At his deportation hearing, Sandoval-Sanchez contended that the evidence offered by the INS should be suppressed as fruit of an unlawful arrest. *Id.* at 1037. The immigration judge determined not only that Sandoval-Sanchez had not been unlawfully arrested, but further that the legality of an arrest was immaterial to a deportation hearing. *Id.* For similar reasons, the BIA dismissed Sandoval-Sanchez's appeal. *Id.* at 1038. Sitting *en banc*, the Ninth Circuit reversed Sandoval-Sanchez's deportation order, holding that because his detention violated the Fourth Amendment, his statements were

No. 12-30793

a product of that detention and the exclusionary rule barred their use in a deportation hearing. *Id.*

The question before the Supreme Court was then "whether an admission of unlawful presence in this country made subsequent to an allegedly unlawful arrest must be excluded as evidence in a **civil** deportation hearing." 468 U.S. at 1034 (emphasis added). The Court first noted "the general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct are not too attenuated." *Id.* at 1040-41. The Court then weighed the likely social benefits of excluding the unlawfully seized evidence against the likely costs, per the framework established in *United States v. Janis*, 428 U.S. 433 (1976), and ultimately concluded "evidence derived from such [unlawful] arrests need not be suppressed in an INS civil deportation hearing." 468 U.S. at 1051.

## II.

In applying *Lopez-Mendoza*, other circuit courts have grappled with reconciling the broad language of the "identity statement" with the facts and issues presented in the case. The Fourth, Eighth, and Tenth Circuits—which concluded the "identity statement" was only a jurisdictional proposition—began their analyses of the case by noting that all of the cases to which the Court cited for the proposition that a defendant's body or identity is not suppressible addressed a court's jurisdiction over a defendant himself—not suppression of unlawfully obtained evidence relating to his identity. *See, e.g.*, *Oscar-Torres*, 507 F.3d at 228 ("*Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) (reaffirming the 'established rule that illegal arrest or detention does not void a subsequent conviction'); *Frisbie v. Collins*, 342 U.S. 519, 522 (1952) ('[T]he power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction.' '); *United States*

12

*ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 158 (1923) ('Irregularities on the part of the Government official prior to, or in connection with, the arrest would not necessarily invalidate later proceedings in all respects conformable to law.')"); *see also Olivares-Rangel*, 458 F.3d at 1111; *Guevara-Martinez*, 262 F.3d at 754. The Fourth Circuit, citing the Tenth Circuit, further found these citations telling—they "indicate[] that the Court's 'identity statement' simply references 'the long-standing rule, known as the *Ker-Frisbie* doctrine, that illegal police activity affects only the admissibility of evidence; it does not affect the jurisdiction of the trial court or otherwise serve as a basis for dismissing the prosecution.'" *Oscar-Torres*, 507 F.3d at 228 (quoting *Olivares-Rangel*, 458 F.3d at 1110).

Each court then addressed the context in which the Supreme Court uttered the "identity statement," finding it further supported the conclusion that this was a jurisdictional holding. They noted that the Court stated "[t]he 'body or identity of a defendant . . . is never itself suppressible" in response to Lopez-Mendoza's contention that the immigration court lacked personal jurisdiction over him due to the illegal arrest, *see Olivares-Rangel*, 458 F.3d at 1111; but, in contrast, when analyzing Sandoval-Sanchez's claim that specific evidence—*inter alia*, his statement that he entered the United States unlawfully—was inadmissible, the court referred to the "general rule in a criminal proceeding." *Guevara-Martinez*, 262 F.3d at 754. The Eighth Circuit found

> it significant that the Supreme Court didn't distinguish between identity-related evidence and other types of evidence when discussing Sandoval-Sanchez's evidentiary challenge. . . . If the Supreme Court meant to exempt identity-related evidence in a criminal proceeding from the "general rule," we believe the Court would have said so while discussing the evidentiary challenge, not the jurisdictional challenge. Our belief is strengthened by the fact

that the evidence that Sandoval-Sanchez challenged, INS Form I-213, probably contained identity-related evidence.[2]

*Id.* The Fourth Circuit similarly reasoned that, "if the Court's 'identity statement' truly prohibited suppression of any evidence relating to identity, surely the Court would have considered which of Sandoval-Sanchez's statements were sufficiently identity-related to render them beyond the reach of the exclusionary rule and which were not." *Oscar-Torres*, 507 F.3d at 229. And the Tenth Circuit held

> The language in *Lopez-Mendoza* merely says that the defendant cannot suppress the entire issue of his identity. A defendant may still seek suppression of specific pieces of evidence (such as, say, fingerprints or statements) under the ordinary rules announced in *Mapp* and *Wong Sun*. **A broader reading of *Lopez-Mendoza* would give the police carte blanche powers to engage in any manner of unconstitutional conduct to long as their purpose was limited to establishing a defendant's identity**. We do not believe the Supreme Court intended *Lopez-Mendoza* to be given such a reading.

*Olivares-Rangel*, 458 F.3d 1111 (emphasis added).

Contrary to the conclusions of these three circuits, this Circuit and the Third and Sixth Circuits have concluded that *Lopez-Mendoza* stands for the proposition that a defendant's identity is never suppressible. *See Roque-Villanueva*, 175 F.3d at 346; *Navarro-Diaz*, 420 F.3d at 588; *United States v. Bowley*, 435 F.3d 426 (3d Cir. 2006). None explicitly addressed the analysis the Fourth, Eighth, and Tenth Circuits presented distinguishing between the jurisdictional and evidentiary holdings of *Lopez-Mendoza*. Instead, this Court established a blanket rule, whereas the Sixth Circuit seemed to focus upon a distinction between attempts to suppress evidence of the defendant's identity,

---

[2] Note that the Supreme Court explicitly framed the issue in *Lopez-Mendoza* as "whether an **admission of unlawful presence in this country** made subsequent to an allegedly unlawful arrest must be excluded as evidence in a civil deportation hearing." 468 U.S. at 1034 (emphasis added).

No. 12-30793

such as his name and birthday, and other evidence, such as fingerprints. *Navarro-Diaz*, 420 F.3d at 586-88. Moreover, the Sixth Circuit found that this reading of *Lopez-Mendoza* does not lead to the dangerous overreach the Tenth Circuit identified, because "we do not deal here with egregious violations of [the] Fourth Amendment or other liberties that might transgress notions of fundamental fairness." *Id.* at 587 (quoting *Lopez-Mendoza*, 468 U.S. at 1050). The Third Circuit similarly "doubt[ed] that the Court lightly used such a sweeping word as 'never' in deciding when identity may be suppressed as the fruit of an illegal search o[r] arrest," and found the Court's only qualification on this rule was that it was not considering "egregious violations of [the] Fourth Amendment." *Bowley*, 435 F.3d at 430.

### III.

All the Circuits seem to agree that if a defendant sought only to suppress his identity itself, he would fail. This conclusion aligns with *Lopez-Mendoza*'s finding that Lopez-Mendoza's claim failed, in part, because "he entered no objection to the evidence offered against him." 468 U.S. at 1040.

The Fourth, Eighth, and Tenth Circuits, however, correctly distinguish between such a broad attempt to suppress one's identity itself and an attempt to suppress evidence relating to one's identity, such as statements made during an unlawful arrest. Indeed, the Supreme Court in *Lopez-Mendoza* seemed to suggest this analysis; it framed the issue in that case as "whether **an admission of unlawful presence in this country** made subsequent to an allegedly unlawful arrest must be excluded as evidence in a **civil** deportation hearing." *Id.* at 1034 (emphasis added). After posing this question—and after stating "[t]he 'body' or identity of a defendant . . . is never **itself** suppressible"—the Court turned to Sandoval-Sanchez's contention that his admission that he entered the United States unlawfully was suppressible. *Id.* at 1039 (emphasis added). The court did not summarily conclude that such an admission is not

15

suppressible because one's identity is not suppressible; instead, the Court referred to the "general rule" regarding suppressibility in a criminal proceeding, and conducted the *Janis* balancing test. The Court found such an analysis necessary in order ultimately to conclude that such statements need not be suppressed in the *civil* deportation hearing. *Id.* at 1040-51. If the Court had been saying that statements relating to one's identity were never suppressible, this rigorous analysis of the costs and benefits of excluding such evidence in a civil deportation hearing would have been wholly superfluous. I virtually repeat myself to observe, as the Fourth, Eighth, and Tenth Circuits highlighted, that if evidence relating to identity were excluded from the general rule, the Court almost certainly would have said so, rather than treating it as it would treat any other potentially suppressible evidence.

On the other hand, the Sixth Circuit's reasoning may be considered as suggesting that some of the alleged evidence is not independent from one's identity, but is so inherently intertwined with one's identity that it necessarily is tantamount to identity itself. Such evidence, it reasons, includes a person's name and birthday. Other circuits have not addressed these particular associations with identity.[3] The Tenth Circuit in *Olivares-Rangel* did, however, find an alien's statements—including that he was an illegal alien—were suppressible. 458 F.3d at 1112. It is not immediately clear whether the Sixth Circuit's conclusion is consonant with *Lopez-Mendoza*. In that case, the Supreme Court clearly evaluated whether Sandoval-Sanchez's statement that he unlawfully entered the United States was suppressible. *See* 468 U.S. at 1034. But it is not obvious what other, if any, statements of his the Court was

---

[3] The Tenth Circuit did, in an unpublished opinion, interpret *Lopez-Mendoza* as preventing suppression of a defendant's statement of his name to an officer. *United States v. Cisneros-Cruz*, 185 F.3d 875, No. 98-1398, 1999 WL 444926, at *6 (10th Cir. June 30, 1999) (unpublished).

considering. In any event, the reasoning of the Sixth Circuit cannot be dismissed out of hand.

Finally, I should make reference to the odd suggestion of the Third and Sixth Circuits to the effect that we are not dealing with "egregious violations of [the] Fourth Amendment or other liberties that might transgress notions of fundamental fairness" in this criminal case. 420 F.3d at 587 (quoting *Lopez-Mendoza*, 468 U.S. at 1050). This "take" from *Lopez-Mendoza* represents a further misreading of that case. Although it is certainly true that the Supreme Court observed that no egregious violation occurred in *Lopez-Mendoza*, it made that statement only when it was evaluating Sandoval-Sanchez's argument that statements he made during his illegal arrest should be suppressed in his subsequent civil deportation hearing. Furthermore, the Supreme Court in *Lopez-Mendoza* went to great length to describe the important differences between criminal and civil proceedings, noting not only that civil deportation hearings look prospectively to a defendant's right to remain in the country whereas criminal proceedings seek to punish past behavior, but further making clear that "various protections that apply in the context of a criminal trial do not apply in a deportation hearing."[4] 468 U.S. at 1038-39; *see also id.* at 1042-50.

## IV.

Hernandez has moved to suppress all the evidence derived from the unlawful stop he endured, and not merely to suppress his identity. It is unclear from the record of this case whether Hernandez made statements to the agents, such as those Sandoval-Sanchez made in *Lopez-Mendoza*, that could potentially be suppressible. Therefore, the proper disposition of this case—but for our precedent—would be to remand for further development of the record. And as the Tenth Circuit noted, allowing our erroneous interpretation of *Lopez-Mendoza*

---

[4] Moreover, the Court noted "the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers." 468 U.S. at 1044.

to persist essentially affords law enforcement officers staggering authority to detain anyone they suspect of being an illegal alien, for so long as they retrieve only evidence related to that person's identity, they will escape any ramifications for even grossly unconstitutional behavior.  Thus, while precedent requires me to concur with the majority, I hope I have made clear that our precedent is an incomplete and erroneous reflection of the propositions for which *Lopez-Mendoza* stands.