*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-449

MILTON D. HOOD, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-7399-15)

(Hon. Kimberly S. Knowles, Trial Judge)

(Argued June 19, 2019                          Decided February 10, 2022)

*Benjamin Miller*, Public Defender Service, with whom *Samia Fam*, was on the brief, for appellant.

*Michael J. Romano*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Gilead Light*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON[*], *Associate Judge*, and RUIZ, *Senior Judge*.

---

[*] Judge Thompson was an Associate Judge of the court at the time of argument. Although her term expired on September 4, 2021, she will continue to serve as an Associate Judge until her successor is appointed and qualifies. *See* D.C. Code § 11-1502 (2012 Repl.) She was appointed on October 4, 2021, to perform judicial duties as a Senior Judge. *See* D.C. Code § 11-1504(b)(3) (2012 Repl.). She will begin her service as a Senior Judge on a date to be determined after her successor is appointed and qualifies.

Opinion for the court by *Associate Judge* THOMPSON.

Opinion concurring in the judgment by *Senior Judge* RUIZ at page 23.

THOMPSON, *Associate Judge*:   A jury found appellant Milton Hood guilty of robbery and assault with intent to commit robbery of two senior citizens.[1]   In this appeal, appellant contends that the trial court erred in admitting the in-court identification of him by the police officer who the trial court found unlawfully detained him after the robbery.[2]   Appellant contends that the government failed to prove that there was an independent source for the officer's identification testimony, and argues that the trial court "was required to suppress the in-court identification as the fruit of the . . . [illegal] detention."   For the reasons that follow, we affirm appellant's convictions.

**I.**

---

[1]   *See* D.C. Code §§ 22-401, -2801, and -3601 (2012 Repl. & 2021 Supp.).

[2]   We accept the trial court's conclusion that the officer lacked a sufficiently particularized and individualized basis for stopping appellant, because the government has not appealed that determination.

At about 11:18 a.m. on the morning of May 29, 2015, an assailant pushed senior citizen Anton Manolache to the ground in the 1500 block of 23rd Street, N.W., after Mr. Manolache refused the assailant's demand for money. The assailant then took Mr. Manolache's wallet and grabbed the purse of Georgetta Manolache, Mr. Manolache's wife.[3] Mrs. Manolache struck the assailant with her cane before he ran from the scene. Stephanie and Sophia Cantizano were driving down 23rd Street at the time and saw Mrs. Manolache defending herself from the assailant with her "walking stick."

Metropolitan Police Department ("MPD") Officer Tanya Butler, who took photographs on the scene as a crime scene officer, arrived there shortly after the robbery. She heard Stephanie Cantizano describe the assailant as a "black male, bald, short with long basketball shorts and with a white T-shirt or cloth[] around his head with a black tank top." A few minutes before the robbery, Amin Nhaila, an Uber driver, and his passenger, Rehanna Raza, saw a man fitting the same description walk out of the Georgetown Gateway Condominium building at 25th and Q Streets, N.W., and head toward 23rd Street. As Mr. Nhaila and passenger Raza

---

[3] Mr. Manolache was 82 years old at the time of trial, and Mrs. Manolache was 77.

drove down 23rd Street, they saw the man assaulting the Manolaches.[4]  Mr. Nhaila saw the man hit the woman victim with a walking stick.  A security system camera in the condominium building had caught a man of the same description who came inside the building and interacted with front-desk clerk William Sheppard in the building lobby at about 11:00 a.m. that morning.  After Ms. Raza, who lived in the building, alerted Mr. Sheppard about the nearby "mugging" and described the assailant, Mr. Sheppard thought the description fit the man who had been in the lobby about twenty minutes earlier, confirmed his impression by pulling up and viewing the security video, and very shortly thereafter made the video and still shots from it available to the police.

Ms. Raza was the only witness who was asked to view a photo array to try to identify the assailant.  A photograph of appellant was in the array, but Ms. Raza identified another man as the only one in the array who seemed to look like the assailant.[5]  None of the witnesses to the robbery made an in-court identification of appellant as the assailant.

---

[4]  Thereafter, Ms. Raza saw the man "trying to run but limping" away, "like he wasn't able to put pressure on both legs."

[5]  The government presented testimony that the photo she pointed to was of a man who, at the time his mug shot was taken, was 6'1" and weighed 210 pounds. The defense presented evidence that appellant is 5'3½" tall.

After leaving the scene of the robbery, Officer Butler resumed patrolling in her service area. Sometime between 1:00 p.m. and 1:15 p.m., as she was driving her police vehicle eastbound on K Street, N.W., approaching 16th Street,[6] she noticed an individual, who was standing about seven feet away, on the median strip that separates the service lane from the main road and who appeared to fit the description of the assailant and his clothing (including the distinctive basketball shorts), except that he was wearing a white shirt. Officer Butler observed the individual walking east toward the crosswalk and then crossing K Street, going north, and then saw him walk to a bus stop on the north side of K Street.[7] In order to continue observing the individual, Officer Butler made a U-turn on K Street. She saw the individual board a bus traveling westbound and then get off at the next stop. Once the individual exited the bus, Officer Butler saw him cross to the south side of K Street and enter busy Farragut Square park. Officer Butler pulled her vehicle over to keep an eye on him. The individual next crossed 17th Street, N.W., and stood in front of another

---

[6] This location, appellant's brief observes, was "proximate" to the location of the robbery.

[7] Officer Butler testified that the man she observed was "walking like he was in some kind of pain" or like he had "twisted something," as if he had "to walk a little bit" and then "pause."

bus stop, and then boarded a bus heading eastbound. At that point, Office Butler had been observing the man for five or six minutes.

During trial, Officer Butler stopped there with her chronology of following the individual who fit the robber's description. But during a pre-trial hearing on a defense motion to suppress, Officer Butler told the court that she signaled to the driver of the eastbound bus that she had seen the man board, boarded the bus herself, and then asked the individual to get off the bus so she could speak with him. Officer Butler detained the individual for over an hour before he was taken to the Second District police station. During the detention, she learned his identity (appellant Milton Hood); saw a fresh, "swelling," lump or knot on his head; saw that he was wearing a black tank top under his white shirt (which she thought could be the one that had earlier been described as being on top of the assailant's head); and heard him make statements that were inculpatory as to what occurred on 23rd Street. Officer Butler arrested appellant after a detective brought still images from the condominium security camera and the officer saw that his clothing and appearance matched those of the person in the images.

Another officer transported appellant to the police station,[8] and Officer Butler went to the station later. There, the Captain asked Officer Butler to turn on her body-worn camera unit "because of the situation that was going on in the cellblock," i.e., appellant's "acting out" as he refused medical treatment. Appellant "was stating that he didn't want to go to the hospital."

On the day after the robbery, a technician swabbed the body of Mrs. Manolache's cane for DNA. Officer Butler obtained a buccal swab from appellant. DNA testing revealed that appellant was a possible contributor to the DNA on the cane, while "[t]he estimate of the proportion of individuals in the general population that would be included as possible donors . . . [was] one in 100 million in the African-American population."[9]

---

[8] After appellant's ride in the transport vehicle, police found on the vehicle floor the "entirety of the contents" from Mr. Manolache's wallet, including credit cards and other cards.

[9] Appellant emphasizes the evidence that Mrs. Manolache's cane was collected from the Manolaches' home a day after the robbery and was not collected from the crime scene; the DNA analyst's testimony that the mixture of DNA on the cane came from at least three people; and the analyst's testimony that there can be indirect transfer of an individual's DNA to items the individual never touched. Defense counsel highlighted those points and also suggested to the jury that appellant's DNA could have come from the tip of the cane having touched spit that was left on a sidewalk somewhere on another occasion. Appellant asserts that the focal point of the government's case was Officer Butler's testimony identifying appellant as the man she followed on the day of the robbery wearing "distinctive"

As noted earlier, appellant's trial counsel filed a pre-trial motion to suppress the fruits of Officer Butler's detention of appellant. After a two-day hearing on the motion, the trial court (the Honorable Todd Edelman) granted a motion to suppress after determining that appellant had been unlawfully detained. In light of the passage of time (about two hours) between the robbery and Officer Butler's spotting of appellant on K Street, the distance between the robbery site and where Officer Butler saw appellant, the discrepancy between his reported height and his height as viewed by Officer Butler, and the discrepancy between his outer (white) shirt and the black tank top, Judge Edelman found that the description of the assailant had not provided a particularized or individualized basis for stopping appellant. Before Judge Edelman had resolved all issues regarding precisely what should be suppressed as fruit of the unlawful stop, the case was transferred to the Honorable Kimberly Knowles.

The defense thereafter filed a supplemental motion to suppress, arguing that Officer Butler should not be permitted to make an in-court identification of appellant because, prior to illegally detaining him, the officer saw him only from a distance

---

shorts "identical" to the distinctive shorts worn by the assailant, and notes that even the prosecutor cautioned the jury against "look[ing] at the DNA without regard to the rest" of the evidence.

and while distracted by driving, and because any ability she had to identify him by face was obtained through seeing him close-up and interacting with him after the unlawful detention had commenced. Judge Knowles's ruling on that motion, and the testimony by Officer Butler that followed, are the subject of this appeal.

## II.

Appellant argued in the trial court that Officer Butler's in-court identification of him "as the man she observed on K Street in the long basketball shorts must be suppressed as the tainted fruit of the Fourth Amendment violation." Judge Knowles disagreed. She acknowledged that Officer Butler "didn't have necessarily a great look at [the man she was following]" and that the man "was across the street" and then "behind the bus." She emphasized, however, that "we're talking about a [trained] police officer whose attention is drawn to somebody who she thinks may have been involved in a crime a couple of hours earlier[,]" "which is a little bit different than a lay person." Judge Knowles also acknowledged that the officer followed the person "initially based on the clothing description" but noted that eventually the officer "observes this person" and "[g]ets on the bus." The court found by clear and convincing evidence that Officer Butler "could in fact" identify appellant as "the person who I saw who got arrested," or "the one who was on the

bus, who got on the bus and who was arrested that day," based on her observations of appellant prior to stopping him. Therefore, the court reasoned, Officer Butler's in-court identification of appellant would be admissible as having a basis independent of the unlawful detention. The court also ruled that Officer Butler would be permitted to testify that appellant was "the one arrested," reasoning that appellant's arrest was not a fruit of his unlawful seizure.

Appellant argues that the trial court's ruling — that Officer Butler had a basis for identifying appellant as the man she observed and followed on K Street that was independent of the unlawful detention — was erroneous. He asserts that Officer Butler "could not possibly . . . make an in-court identification of Hood as the man she saw before the stop that was untainted by the illegality" and thus that the officer "lacked the required independent basis to identify Mr. Hood at trial." Appellant further contends that the court "commit[ed] constitutional error in ruling that [the] officer's identification testimony linking Mr. Hood to the crime was not suppressible fruit of his illegal detention and arrest[.]"

**III.**

In *Wong Sun v. United States*, 371 U.S. 471 (1963), the Supreme Court articulated the general principle that evidence derivatively obtained from a Fourth Amendment violation is inadmissible against the accused at trial. *Id.* at 484 (stating that "[t]he exclusionary prohibition extends as well to the indirect as the direct products of such invasions"). "As subsequent cases have confirmed, the exclusionary sanction applies to any 'fruits' of a constitutional violation – whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470 (1980) (footnotes omitted). This court has explained that "[e]vidence derived, directly or indirectly, from violation of a defendant's Fourth Amendment rights is subject to exclusion at the defendant's trial unless the prosecution demonstrates that 'the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the taint imposed upon that evidence by the original illegality.'" *In re K.H.*, 14 A.3d 1087, 1092 (D.C. 2011) (quoting *Crews*, 445 U.S. at 471) (internal quotation marks omitted). Further, "[i]f knowledge of [facts] is gained from an independent source they may be proved like any others[.]" *Nardone v. United States*, 308 U.S. 338, 341 (1939) (articulating the so-called "independent source doctrine"). Thus, in this case, if Officer Butler

"would have recognized appellant at the time of trial [even] if th[e] intervening [unlawful detention] had not occurred," *United States v. Wade*, 388 U.S. 218, 242 (1967), i.e., if her "courtroom identification rested on an independent recollection of her initial encounter" with appellant, *Crews*, 445 U.S. at 473, her identification testimony was not a fruit of the constitutional violation and was admissible. *In re T.L.L.*, 729 A.2d 334, 343 (D.C. 1999).

In reviewing the trial court's ruling on a motion to suppress, we defer to the trial court's findings of fact unless clearly erroneous, but we review the trial court's legal conclusions *de novo*. *See Maddox v. United States*, 745 A.2d 284, 289 (D.C. 2000). Our review is *de novo* with respect to whether a Fourth Amendment violation requires suppression of an identification. *Oxner v. United States*, 995 A.2d 205, 207 n.4 (D.C. 2010).

**IV.**

To recap, appellant's contentions are that "[t]he trial court erred [1] in admitting Officer Butler's in-court identification and [2] in allowing her to testify that the man she saw on K Street in the suspect clothing was Milton Hood." We begin our analysis by focusing on the testimony that Officer Butler actually gave. During her direct examination at trial, the following exchange occurred:

> Prosecutor: [A]t some point after you followed this person around, was the same person that you followed arrested that day by the Metropolitan Police Department?
>
> Officer Butler: Yes.
>
> Prosecutor: Do you see the person who you followed [on K Street] and who was arrested sitting here in court today?
>
> Officer Butler: Yes.
>
> Prosecutor: Would you please point that person out and identify him by a piece of clothing that he's wearing?
>
> Officer Butler: He's sitting with his defense attorney. He has a black vest on, pullover vest.
>
> Prosecutor: May the record reflect an in-court identification of this defendant.

The prosecutor then asked Officer Butler whether, at some point after appellant was stopped, she had "a chance to view surveillance photos that were taken from another location[.]" After Officer Butler answered in the affirmative, the prosecutor asked her to compare what she saw in those photos to appellant's appearance when she saw him on K Street. Officer Butler responded that appellant's hairstyle, skin color, build, and shorts as she saw them on K Street were "[e]xactly the same" as depicted in the (Georgetown Gateway Condominium) surveillance photos.

**A.**

Appellant contends that the evidence established that Officer Butler did not "g[e]t a good look at [appellant's] face" when she spotted him on K Street and followed him and that her "attention was divided when she made observations[.]" He notes that at the suppression hearing, the government did not even attempt to establish,[10] let alone prove clearly and convincingly, that there was an independent source for Office Butler's identification of him, i.e., that the government failed to prove that the officer's ability to identify appellant by face was not tainted by the opportunity she had for over an hour to view and interact with him during the illegal detention.

Appellant argues persuasively that before Officer Butler boarded the eastbound bus to approach the man she was following, the officer had at best a limited opportunity to observe his face. Appellant recounts the officer's testimony that she followed the man she spotted on K Street for a total of only about five or six minutes before detaining him, and did so while he was seven feet away from her vehicle, facing away from her eastbound vehicle as he was walking east toward a

---

[10] Appellant asserts that the government thereby waived or forfeited any claim that there was an untainted, independent source for Officer Butler's identification testimony. However, the issue is preserved for appeal because the trial court found that Officer Butler's in-court identification had an independent source.

crosswalk, or facing north as he waited to cross the street; or while he was on a bus a car-length in front of her vehicle; or while he was at a distance across a crowded park. Further, appellant emphasizes, as Officer Butler testified and as the trial court found, she was initially focused on the man's clothing (which, of course, he was not wearing during trial). She was also distracted by driving and, as she testified, at one point was radioing for confirmation of the clothing description she had heard at the scene of the robbery. Appellant additionally emphasizes Officer Butler's testimony that she anticipated that eyewitnesses to the robbery would be asked to make a show-up identification, not that she (Officer Butler) would be the government's identification witness at trial. Thus, appellant argues, Officer Butler would not have been motivated to commit to memory the physical features of the man she was tailing.

What appellant's argument does not overcome, however, is the impact of Judge Knowles's conclusion, which we uphold as supported by the record and the law, that there was no illegal stop until Officer Butler instructed appellant to come off the bus. Appellant contends that for Fourth Amendment purposes, the stop or seizure occurred when Officer Butler signaled to the bus driver. But, as Judge Knowles correctly observed, Officer Butler testified that the light was "going to turn" and that she knew the bus, which was in the curb lane, would *soon* "take off."

In other words, the bus was facing a red light and was not yet in motion when the officer signaled to the driver. Thus, the testimony supports a finding that the bus was already stopped and a conclusion that the seizure occurred not when the officer signaled to the bus driver, but after Officer Butler approached appellant on the bus and asked him to follow her off the bus, which he did.[11] That means that the (brief) opportunity Officer Butler had to view appellant close-up as she approached him after boarding the bus gave her a pre-unlawful-detention opportunity to view his features.

In addition, the record indicates that Officer Butler had a further opportunity (at least five minutes, according to appellant's estimate) to view appellant's face and features when she returned to the Second District police station after appellant was arrested, and her Captain asked her to turn on her body-worn camera to record appellant's "acting out" conduct as he was refusing to go to the hospital for medical treatment. This post-detention interaction is aptly characterized as an intervening circumstance — an opportunity for observation occasioned by appellant's apparent need for, but resistance to, medical attention — that was unrelated to the unlawful

---

[11] *See Brendlin v. California*, 551 U.S. 249, 254 (2007) ("[T[here is no seizure without actual submission[.]"); *but see Torres v. Madrid*, 141 S. Ct. 989, 1001 (2021) (clarifying that the rule is different when force is used, as the "requirement of control or submission never extended to seizures by force").

detention, and that broke or attenuated the chain of causation and "remove[d] the taint imposed . . . by the original illegality." *In re K.H.*, 14 A.3d at 1092 (internal quotation marks omitted); *see also Utah v. Strieff*, 579 U.S. 232, 235 (2016) ("Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." (internal quotation marks omitted))[12]; *cf. United States v. Oscar-Torres*, 507 F.3d 224, 231, 232 (4th Cir. 2007) ("[W]hen fingerprints are administratively taken for the purpose of simply ascertaining the identity or immigration status of the person arrested, [not to provide evidence for a criminal prosecution] they are sufficiently unrelated to the unlawful arrest that they are not suppressible." (internal quotation marks and ellipsis omitted)).[13]

---

[12] In *Strieff*, an officer "ma[de] an unconstitutional investigatory stop; learn[ed] during that stop that the suspect [was] subject to a valid arrest warrant; and proceed[ed] to arrest the suspect and seize incriminating evidence during a search incident to that arrest." *Id.* The Court held that "the evidence the officer seized as part of the search incident to arrest is admissible because the officer's discovery of the arrest warrant attenuated the connection between the unlawful stop and the evidence seized incident to arrest." *Id.*

[13] Appellant's brief treats Officer Butler's interaction with appellant at the Second District station as part of the illegal detention. He does not explain why this court should do so, though seems to imply that there is a "but for" relationship between the illegal detention and everything that happened at the Second District

For the foregoing reasons, we cannot conclude that Judge Knowles was required to find that Officer Butler's ability to identify appellant in court as the man in the distinctive basketball shorts whom she followed on K Street was "influenced unduly by" her exposure to him during his unlawful detention. *K.H.*, 14 A.3d at 1093. Rather, we agree with the trial court's ruling that Officer Butler had a basis, independent of and untainted by the illegal stop, for making the observations by which she could identify appellant in court, and that her identification testimony was therefore admissible.

---

station. But the Supreme Court has expressly declined to employ a "but for" test in determining whether evidence is a suppressible fruit of a Fourth Amendment violation. *See Wong Sun*, 371 U.S. at 487–88 (declining to hold "that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police."). In *Crews*, the Supreme Court rejected this court's reliance on the reasoning that "but for [the] unlawful arrest, the police would not have obtained the photograph that led to [Crews'] subsequent identification by the complaining witnesses and, ultimately prosecution of the case." 445 U.S. at 469 (referring to *Crews v. United States*, 389 A.2d 277, 290 (D.C. 1978) (en banc)). The Supreme Court reversed this court's en banc ruling, concluding that neither the victim's nor defendant Crews's presence at trial "had been come at by exploitation of the violation of [Crews's] Fourth Amendment rights." *Id.* at 471. The effect of the Court's opinion was to reinstate the ruling by which the majority of a three-judge division of this court rejected Crews' argument that exclusion of certain identification testimony was required because "absent his arrest and detention," there would have been "no opportunity for the chain of . . . circumstances to coalesce into the incriminating identification testimony." *Crews v. United* States, 369 A.2d 1063, 1067, 1072 (D.C. 1977), *rev'd*, 389 A.2d 277, 282 (D.C. 1978) (en banc), *rev'd sub. nom. United States v. Crews*, 445 U.S. 463 (1980).

There is yet another principle that undermines appellant's claim that he is entitled to relief because of the prejudicial effect of Officer Butler's testimony identifying him as the man she saw on K Street. We have said that where the government improperly elicits evidence but the defense "turn[s] the violation to its own advantage," the defendant cannot on appeal "be heard to complain of the prejudice [the evidence] allegedly caused." *Mack v. United States*, 570 A.2d 777, 778 n.1 (D.C. 1990). The same applies in this case. Despite vigorously litigating the issue of whether Officer Butler would be permitted to make an in-court identification of appellant as the man she saw on K Street, defense counsel multiple times sought to turn the officer's identification testimony to appellant's advantage. Counsel did not simply try to take the sting out of the evidence that had been admitted. He did that, to be sure, arguing in closing that "back[ing] up to when Officer Butler s[aw] Mr. Hood on K Street[,]" "there was nothing suspicious about [appellant] being out there on K Street." But counsel also referred repeatedly to Officer Butler's having seen appellant on K Street and sought to establish through Officer Butler's testimony that "the features [appellant] has . . . are the same as he had back then." Counsel elicited Officer Butler's agreement that appellant appears bald, has a mustache, has a medium to light complexion, and is an "older guy," all "same as when you saw him walking on K Street." Similarly, in closing argument,

counsel told the jury that "there was nothing defective or misleading" about the photo of appellant in the array that Raza viewed and that in the photograph, appellant "appears, bald man, mustache, the same way Officer Butler saw him when she was on K Street . . . that afternoon." In short, appellant's trial counsel emphasized to the jury the detailed observations about appellant's physical appearance that Officer Butler was able to make when she saw appellant walking on K Street on the day of the robbery, in order to imply that because Raza did not recognize appellant as the robber from a photograph of him shown to her later the same afternoon, he could not have been the robber. Appellant cannot be heard now to complain that he is entitled to reversal of his conviction on the ground that he was prejudiced by admission of Officer Butler's identification of him as the man she followed on K Street.

**B.**

What is further at issue in this case, appellant argues, is that "the government learned and later introduced identification evidence—i.e., it was Hood who wore the incriminating clothing—by exploiting the illegal detention during which the police ascertained his identity." Appellant asserts that "[t]he critical information that police gained from the stop was that the man who piqued Officer Butler's attention because he was wearing the distinctive basketball shorts relatively close in time to the crime

was determined to be Milton Hood through his arrest and detention." He cites a case in which this court reasoned that if "the discovery of [a suspect's] name itself . . . resulted from . . . illegal [police conduct,]" it should be excluded.[14] *Douglas v. United States*, 386 A.2d 289, 292 (D.C. 1978).[15]

---

[14] As the transcript excerpt quoted above shows, Officer Butler did not actually say appellant's name, Milton Hood, but the lengthy discussion between the court and the parties about the permissible scope of the Officer Butler's testimony shows that presenting her testimony about the identity of the man she followed was the government's objective. The prosecutor argued that Officer Butler should be able to testify, "[T]his person [whom I followed on K Street] was arrested[] [a]nd his name is Milton Hood and that's him sitting right there." Appellant acknowledges that the "fact of [his] arrest" is not "what is truly at issue."

[15] Appellant also relies on two Florida appellate court decisions for the same principle: *Garrett v. State*, 946 So. 2d 1211, 1214 (Fla. Dist. Ct. App. 2006) (suppressing in-court identification of Garrett as the person the deputy saw in a location that violated the terms of Garrett's community supervision, on the ground that "[i]t was only because the deputy made the illegal seizure that he learned Garrett's identity" and his supervision status); *Delafield v. State*, 777 So. 2d 1020, 1021 (Fla. Dist. Ct. App. 2000) (reversing defendant's conviction for driving with a suspended license because police discovered that infraction only after learning the defendant's identity during an unlawful traffic stop; reasoning that "identity is no different from other evidence that must be suppressed following an unconstitutional stop"). In relying on *Garrett* and *Delafield*, appellant fails to take into account the more recent Florida appellate court ruling in *Hicks v. State*, 189 So. 3d 173 (Fla. Dist. Ct. App. 2016) (holding that "the trial court properly allowed the officer to identify [Hicks] as the man he saw fleeing" from the rear of a store whose silent alarm had been triggered, even though the officer had lacked a sufficient basis for stopping Hicks and evidence obtained during the illegal stop was suppressed). The *Hicks* court distinguished *Garrett* and *Delafield* on the ground that "the officer[] could not have known the defendant[] had committed a crime until they discovered incriminating information *during* the illegal stops," while in Hicks's case, "none of the information learned during the detaining officer's detention of [Hicks] was permitted to be used in the trial, other than [permissibly, his] name." *Id.* at 177. This

In advancing this argument, appellant fails to deal with the Supreme Court's post-*Douglas* ruling, in *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), that "[t]he 'body' or *identity* of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it conceded that an unlawful arrest, search, or interrogation occurred." *Id.* at 1039 (emphasis added); *see also Cruz v. Barr*, 926 F.3d 1128, 1136 n.3 (9th Cir. 2019) (interpreting *Lopez-Mendoza* to create "an evidentiary rule insulating specific pieces of identity-related evidence from suppression"); *United States v. Chagoya-Morales*, 859 F.3d 411, 419, 419 n.14 (7th Cir. 2017) ("[M]ost of the circuits that have addressed the problem remain convinced that a person's identity is simply not subject to suppression.") (collecting cases); *United States v. Bowley*, 435 F.3d 426, 430 (3d Cir. 2006) (applying *Lopez-Mendoza* in deciding that identity evidence was not suppressible in a criminal prosecution, because "we doubt that the Court lightly used such a sweeping word as 'never' in deciding when identity may be suppressed as the fruit of an illegal search o[r] arrest"); *Navarro-Chalan v. Ashcroft*, 359 F.3d 19, 22 (1st Cir. 2004) ("Navarro's name is not information even subject to being suppressed.");

---

case is like *Hicks*: other than appellant's identity, none of the information derived from and none of the evidence collected during the unlawful detention was allowed to be used at trial; and Officer Butler's suspicion of appellant was based on her viewing of him, and on the recollection she had of the assailant's description, before the unlawful detention.

*United States v. del Toro Gudino*, 376 F.3d 997, 1001 (9th Cir. 2004) ("[T]he simple fact of who a defendant is cannot be excluded, regardless of the nature of the violation leading to his identity."). We agree with the government that appellant's identity was not a suppressible fruit of the Fourth Amendment violation.

For all the foregoing reasons, we conclude that appellant is not entitled to relief. Wherefore, the judgment of the Superior Court is

*Affirmed*.

Ruiz, *Senior Judge*, concurring in the judgment: This appeal presents an important question of law under the Fourth Amendment: when is an identification suppressible as the "fruit" of a detention that violates the constitutional guarantee against unlawful seizures? The facts are straightforward but their relevance to the Fourth Amendment analysis is more complicated. Appellant was observed for 5-6 minutes, mostly from a distance on a busy street, by an officer who seized him because he partially fit the description of the perpetrator of a robbery at a time and place removed from the robbery. The trial court found the seizure was unlawful because the officer lacked reasonable articulable suspicion, a finding the government has not appealed. The same officer who seized appellant then spent over an hour

observing him further and acquiring incriminating information while he was illegally detained. She then arrested him, based on the illegally obtained information. As a result of the arrest, appellant was taken to the police station where the officer had a further close interaction with appellant. At trial twenty months later, the same officer identified appellant in court as the person she had followed and who had been arrested.

The question for the court is whether the officer's in-court identification of appellant should have been suppressed as fruit of the illegal detention, or whether it could be admitted because the government proved, by clear and convincing evidence, there was a lawful source for the officer's in-court identification that was independent of the illegal seizure. *See United States v. Wade*, 388 U.S. 218, 240 (1967). I conclude that the officer's in-court identification was the fruit of the unlawful seizure and arrest and should have been suppressed because it did not have an independent source that would remove the taint of the unconstitutional seizure. I concur in the judgment because I also conclude that the error was harmless beyond a reasonable doubt. Even so, I express my view on the Fourth Amendment question as it is different from that of the majority opinion and there will be future cases where the error will not be harmless.

The majority decides that the officer's in-court identification of appellant as the person she observed and arrested was permissible. It arrives at this conclusion through a process of segmenting the officer's observations into 3 time frames:

>1. Pre-illegal seizure. For 5-6 minutes the officer saw appellant from across the street while she was driving and he was in motion, walking up and down the street, crossing at an intersection, and going in and out of a bus. The officer got out of the car, entered a bus he had boarded and asked him to follow her off the bus. This was the illegal seizure, lacking reasonable articulable suspicion.

>2. Post-illegal seizure. For approximately 75 minutes, the officer continued the unlawful detention of appellant. During this time the officer observed appellant at close range while sitting on a bench at a bus stop. She saw a bruise on his head consistent with having been hit with the cane wielded by one of the assault victims, noticed that he wore a black tank top under a white shirt (the perpetrator had been described as wearing a black tank top), compared her up-close observation of appellant to photos of the man shown on security camera video in a building close to where the assault took place from where the man was seen headed to that location, and heard appellant make incriminating statements. The officer arrested appellant.

>3. Post-illegal arrest. Following the arrest, appellant was taken to the police station. The officer had further opportunity to observe appellant at close range at the police station as she tried to get him to go to the hospital for medical attention.

The majority concludes that the officer's in-court identification of appellant as the man she observed and subsequently arrested was untainted by the illegality of his detention because it had an independent source in the officer's observations before the officer unconstitutionally seized appellant on the bus and later at the police station.

I cannot agree that these two periods of observation provide an independent source for the in-court identification that can be plucked from the totality of the officer's engagement with appellant and deemed constitutionally separable from and untainted by the much longer period that the officer held appellant illegally. In addition to its short duration, the officer's pre-seizure observation was from a distance and while both the officer and appellant were in motion on a busy downtown street and then, even more briefly, on the bus. In contrast, while the officer had appellant in her illegal custody, she was able to observe him up-close for a much longer period and obtained incriminating information that would have fixed his identity in her mind as the perpetrator. There was no temporal separation at all between the short pre-seizure period and the much longer period of illegal detention. The record is not clear as to the exact timing of the officer's interaction with appellant at the police station, but it appears to have taken place in short order and lasted approximately five minutes. In any event, the officer's observation of

appellant at the police station cannot be relied upon as an independent source because it followed from the illegal seizure and arrest and involved the same officer who engaged in the illegality. [1]

The issue in this case is not whether the trial court should have suppressed the fact that appellant was arrested. *See People v. Young*, 434 N.E. 2d 1068, 1071 (N.Y. 1982) ("An illegal arrest, without more, has never been envisioned as a bar to prosecution or as a defense to a valid conviction.") citing *Crews*, 445 U.S. at 474. That a defendant at trial was arrested is a given and no one doubted the chain of custody of appellant's person from the time of arrest to trial. The relevant question

---

[1] The interaction at the police station was not "remote" nor an administrative "intervening circumstance" unrelated to the illegal detention, as when fingerprints are taken in the normal course. The fact that the same officer who made the illegal detention was involved throughout links the interactions in a way that is relevant to the constitutional inquiry here: whether the officer had an independent basis to remember appellant when she identified him in court as the person she observed and was arrested twenty months earlier. This is not a bare "but for" argument, *see ante* n.9, and a far cry from the situation in *United States v. Crews*, 445 U.S. 463 (1980). In *Crews* the Supreme Court made clear that the in-court identification *by the victim* was not tainted by the officer's illegal detention of the defendant because neither the victim's presence at trial nor her identification was linked to the illegality. The victim had called the police right after the robbery and cooperated with the investigation; she had not been sought out by the police following the illegal detention, *Id*. at 471-72. The Court concluded that the in-court identification was admissible because "the police's knowledge of respondent's identity and the victim's independent recollections of him both antedated the unlawful arrest and were thus untainted by the constitutional violation." *Id*. at 477. The opposite is true in this case.

under the Fourth Amendment is whether the officer's *recollection at trial* that the "same person" that she followed and was arrested in 2015 was "sitting here in court today" in 2017 should have been suppressed. If there had been no illegal seizure, the officer's in-court identification would have been admissible subject to the usual cross examination and left to the jury's determination of the officer's credibility and reliability. But because there was an illegal seizure, the government had the burden to establish, by clear and convincing evidence, that the officer's ability to identify appellant when the trial was held twenty months later had an independent source untainted by the illegal seizure. *Wade*, 388 U.S. at 240. The government has not met that burden because a holistic view of the length and conditions under which the officer observed appellant before and after the illegal seizure does not support that the officer's recollection was free of the taint of illegality. The trial court did not address this head-on in ruling that the in-court identification was admissible, a ruling the trial court seemed to tie to the ruling that the officer could testify about the fact that appellant was arrested. On this record, it is difficult to conceive that an in-court identification so many months later was based solely on a shorter period of observation under poorer conditions before the illegal seizure and was not influenced by the much longer and closer interactions with appellant under better viewing conditions during the illegal detention at the bus stop and at the police station. Certainly, the government cannot be said to have proved so by clear and convincing

evidence. *Cf. United States v. Crews*, 445 U.S. 463, 473 & n.18 (1980) (permitting in-court identification by victim who "viewed her assailant at close range for a period of 5-10 minutes under excellent lighting conditions and with no distractions," the defendant "closely matched the description given by the victim immediately after the robbery," and the victim twice selected the defendant from "non-suggestive pretrial identification procedures," with the first being one week after her observation of the assailant).

Other items of evidence that were more probative of appellant's guilt came to the government's attention as a result of the illegal detention and were not introduced at trial: appellant's incriminating statements caught on body-cam that someone who looked like him had committed the assault, an injury to appellant's head that could have been caused by being hit by Mrs. Manolache's cane, that appellant was wearing a black tank top (like the perpetrator had worn) under his white shirt, and the contents of Mr. Manolache's wallet found in the transport vehicle to the police station. The officer's recollection that she recognized the defendant in court as the same man she had followed and arrested on K Street was similarly tainted by the illegal seizure and likewise should not have been admitted.

Even though the officer's in-court identification of appellant as the same man she followed and arrested should have been suppressed, its erroneous admission does not require reversal of appellant's convictions. The officer's testimony in court was fairly limited and not particularly incriminating. She testified about her (pre-illegal seizure) observation of a man who partially fit the description of the perpetrator in that he was a bald Black man, wearing long dark shorts with a stripe down the side, a black tank top and something white on his head.[2] As the trial court noted in ruling the seizure was unlawful, it was a fairly generic description that could have applied to any number of Black men in the District during an early summer month. Moreover, her observation of the man was two hours after the assault and took place in downtown 16th and K Streets, NW, a ways removed from where the assault took place by Rock Creek Park at 23rd and O Streets. Appellant does not challenge admission of the officer's narrative of how he came to be seized. The disputed identification came when the officer testified that the man she had followed and was arrested was seated with his defense counsel. This was hardly a significant revelation.

---

[2] When the officer detained appellant, the officer had seen neither a black tank top nor anything white on his head. At trial the officer added details about the height, weight and build of the man she observed and arrested but none of these details had been conveyed to her before the seizure.

The government presented much more compelling evidence of appellant's guilt. There were several eyewitness descriptions of the robbery and the perpetrator (although none identified appellant and one failed to pick his picture from a photo array, pointing to another picture instead). There was also a video the jurors saw of a man with long striped shorts in the lobby of a building from where he was seen leaving close in time and in the direction of the assault and robbery. Although the officer testified she identified appellant from still photographs from the video, the jurors could do so for themselves and compare the man in the video with the defendant in court before them — as the prosecutor urged them to do at closing. The analysis of DNA found on the cane Mrs. Manolache used to fend off the attacker further incriminated appellant as the perpetrator. The government's expert testified that appellant was included as a possible donor and that the probability a person would be a donor was "one in 100 million in the African-American population." The defense relied on a "transfer theory" as an innocent explanation for the presence of appellant's DNA on the cane, arguing the genetic material could have found its way to the cane if, for example, it had come in contact with the pavement where he had spit or close to where he had sneezed.[3]  This argument was highly speculative,

---

[3]  The government did not conduct serological tests on the DNA so it was unknown whether it came from blood (which would have corroborated that appellant was the attacker Mrs. Manolache hit with her cane), saliva, or some other source.

however, and it was a double-edged sword as such an explanation would place the bald appellant, who wore the incriminating long shorts, close to the victims.

Taken together the government's evidence — the eyewitness descriptions, the video and the DNA — presented an overwhelming case that appellant was the perpetrator. That substantive evidence of guilt greatly overshadowed the officer's in-court identification of appellant as the person she had observed for a few minutes and had subsequently been arrested, facts that were uncontested and did little to point to appellant's guilt. On this record, I conclude that the verdict "was surely unattributable" to the officer's in-court identification and its erroneous admission was therefore harmless beyond a reasonable doubt. *Ellis v. United States*, 941 A.2d 1042, 1049 (D.C. 2008) (quoting *Sullivan v. Lousiana*, 508 U.S. 275, 279 (1993) ("[T]he inquiry [under Chapman] . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether *the guilty verdict actually rendered in this trial was surely unattributable to the error*.") (emphasis in original).[4]

---

[4] The majority contends that appellant cannot complain on appeal that he was prejudiced by the officer's in-court identification because at trial the defense used the officer's description of appellant to highlight that an eyewitness was unable to identify him from a photo array. This is an argument the government has not made. Even if it were appropriate for the Court to raise this argument *sua sponte*, I am not sure the general principle the majority invokes is fairly applied in this case. The

defense sought to suppress the officer's in-court identification of appellant because it was the fruit of an illegal seizure, not on the grounds that she could not make a reliable identification in court. That, in fact, is the crux of the argument that the officer's in-court testimony was tainted by the officer's ability to observe appellant at close range and for a long period of time during the illegal detention. *See supra* n.2.