**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-4297**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

FRANCISCO ESCAMILLA VILLA, a/k/a William Villa-Escamilla, a/k/a Willian Villa-Escamilla, a/k/a William Escamilla Villa, a/k/a William Villa,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:19-cr-00077-MR-WCM-1)

Argued:  January 26, 2022                      Decided:  June 13, 2023

Before HARRIS and RUSHING, Circuit Judges, and FLOYD, Senior Circuit Judge.

Affirmed by published opinion.  Judge Rushing wrote the opinion, in which Judge Harris and Senior Judge Floyd joined.

**ARGUED:**  Ann Loraine Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  Anthony Martinez, Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  R. Andrew Murray, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

RUSHING, Circuit Judge:

Francisco Escamilla Villa was convicted of illegally reentering the United States after an aggravated felony conviction. He challenges his conviction on numerous fronts, claiming vindictive prosecution and violations of his constitutional rights to a speedy trial, due process, and freedom from unreasonable searches and seizures. We affirm.

I.

After receiving tips and conducting surveillance, North Carolina police suspected Villa of trafficking illegal drugs. On June 7, 2018, officers surveilling Villa stopped his vehicle for traffic infractions. Villa's car smelled of marijuana, and he admitted he had recently smoked marijuana. After exiting the vehicle, Villa consented to a search of his person, and officers discovered a marijuana vapor pen and more than $3,000 in cash. During the traffic stop, Villa was cooperative and answered questions from the officers. Villa said he was a noncitizen who had been in the United States since age seventeen, claimed he had no other drugs but admitted having firearms in his home, and invited officers to search his house. To confirm he consented to a search of his residence, Villa signed a consent-to-search form. The ensuing search uncovered firearms, ammunition, thousands of dollars in cash, and drug paraphernalia.

Officers arrested Villa on state charges of possession of marijuana and marijuana paraphernalia. Villa was taken to the Macon County detention center, where he was fingerprinted as part of the routine booking process. That evening, an agent from the Department of Homeland Security (DHS) spoke with Villa, who confirmed he was a noncitizen and had no legal immigration status. Using this information, the agent filed an

immigration detainer stating probable cause existed to find Villa removable.  Villa did not mention to the agent that he had previously been removed from the United States.

The next day, one of the arresting officers filed a federal criminal complaint charging Villa with possession of a firearm by an illegal alien in violation of 18 U.S.C. § 922(g)(5) and illegal entry in violation of 8 U.S.C. § 1325(a).  The officer also searched for, but did not find, any previous criminal history under the name "Francisco Escamilla Villa" and the birthdate Villa provided.  Villa was transferred into federal custody pursuant to an arrest warrant on the criminal complaint.  After his federal arrest, the United States Marshals Service fingerprinted Villa as part of its routine booking process.

Over the next several days, the probation office prepared a pretrial services report about Villa.  It indicated that, in 2008, Immigration and Customs Enforcement (ICE) had charged Villa with illegal entry and "Alien Removal Under Section 212 and 237."  J.A. 1355.  The disposition of the charges was "unknown."  J.A. 1355.  The report also showed that Villa had two felony convictions, both drug related.

On June 20, 2018, a federal grand jury indicted Villa on the charge of possessing a firearm as an illegal alien in violation of 18 U.S.C. § 922(g)(5).[1]  At the time, a conviction under Section 922(g) carried a statutory maximum sentence of 10 years.  *See* 18 U.S.C. § 924(a)(2) (2018).  Villa pleaded not guilty.

---

[1] Because the indictment did not include the illegal-entry charge from the criminal complaint, the district court administratively terminated that charge.

3

Early in the case, Villa successfully moved to continue the pretrial motions deadline. Then, in August 2018, Villa moved to suppress evidence from the traffic stop and the search of his residence. While briefing for the suppression motion was ongoing, Villa obtained several continuances of his trial to allow for adjudication of the motion. Villa "waive[d] his speedy trial rights for" the purpose of these continuances. S.J.A. 8, 14. The government also sought and received two extensions of time to respond to Villa's motion. In December 2018, a magistrate judge held a hearing on the motion. Over the six months following the hearing, Villa again obtained several continuances of his trial while his suppression motion remained pending. For two of these continuances, Villa again said he "waive[d] his speedy trial rights." S.J.A. 20, 27.

In June 2019, roughly ten months after filing his motion to suppress and six months after the hearing, Villa asserted his speedy-trial rights and requested a ruling on his suppression motion. Three days later, on June 10, 2019, the magistrate judge issued a memorandum recommending that the district court grant Villa's motion to suppress evidence collected from his home (including the firearms and ammunition) and deny the remainder of the motion. Both sides objected. In July 2019, the district court overruled the parties' objections and adopted the magistrate judge's recommendation in full.

While Villa's suppression motion remained pending in June 2019, the government began considering how it would prove Villa's alien status at trial for the Section 922(g) charge. The prosecutor requested assistance from the DHS agent who had previously spoken with Villa about his immigration status. Realizing that Villa's fingerprints had not been checked against law enforcement databases, the agent obtained Villa's fingerprints

from the United States Marshals Service and, on June 20, 2019, checked them against the ICE database. That search confirmed the two felony convictions listed in Villa's pretrial services report, and it revealed that Villa had previously been removed from the United States under the alias "William Villa-Escamilla." By August 2, 2019, the agent had obtained the criminal records for Villa's two prior felonies and Villa's "A-file," an official immigration record that documented Villa's previous removal. Although Villa had told officers during the traffic stop that he had been in the United States since he was seventeen, the A-file proved that Villa had been removed in 2011 at a port of entry in Texas, meaning he had reentered the United States sometime later.

On August 6, 2019, fourteen months after Villa's initial arrest but four days after receiving his A-file, the government obtained a new indictment charging Villa with illegal reentry after conviction for an aggravated felony in violation of 8 U.S.C. § 1326(a), (b)(2). That offense carries a 20-year statutory maximum, double the maximum for the Section 922(g) charge. The day of Villa's initial appearance on this second indictment, the government moved to dismiss the Section 922(g) charge. The district court granted that motion two days later.

Villa moved to dismiss the aggravated reentry charge on numerous grounds, claiming that the second indictment was a vindictive prosecution in retaliation for undermining the first indictment by successfully moving to suppress key evidence, that the delay between his arrest and trial violated his speedy-trial rights, and that the delay between his arrest and the second indictment violated his due process rights. Villa also moved to

5

suppress his fingerprint records and the criminal and immigration records they uncovered. After a hearing, the district court denied Villa's motions in two written orders.

Villa waived his right to a jury trial. Nineteen months after his arrest, and just short of six months after the grand jury returned the second indictment, the district court convicted Villa of aggravated reentry at a bench trial. The court sentenced Villa to 42 months' imprisonment. This appeal followed.

## II.

We first consider Villa's claim that the district court erred in denying his motion to dismiss the second indictment for prosecutorial vindictiveness. Typically, "[w]e review the district court's factual findings on a motion to dismiss an indictment for clear error" and "review its legal conclusions de novo." *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014) (internal quotation marks omitted). Similarly, we review de novo "the legal adequacy of the evidence to support" a "presumption of vindictive prosecution." *United States v. Wilson*, 262 F.3d 305, 316 (4th Cir. 2001).[2]

A prosecutor violates the Due Process Clause of the Fifth Amendment by punishing a defendant for "exercising a protected statutory or constitutional right." *United States v. Fiel*, 35 F.3d 997, 1007 (4th Cir. 1994); *see United States v. Goodwin*, 457 U.S. 368, 372 (1982). "To establish prosecutorial vindictiveness, a defendant must show, through

---

[2] As the parties acknowledge, our precedents have sometimes invoked an abuse-of-discretion standard for reviewing a district court's application or denial of a presumption of vindictiveness. *See, e.g.*, *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003); *United States v. Fiel*, 35 F.3d 997, 1007 (4th Cir. 1994). We need not resolve the tension, if any, between these cases because, even applying the more generous de novo standard, we conclude the evidence here cannot legally support a presumption of vindictiveness.

objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *Wilson*, 262 F.3d at 314; *see United States v. Ball*, 18 F.4th 445, 454 (4th Cir. 2021); *United States v. Jackson*, 327 F.3d 273, 294 (4th Cir. 2003). Absent this kind of direct evidence, a defendant may state a claim indirectly with "evidence of circumstances from which an improper vindictive motive may be presumed." *Wilson*, 262 F.3d at 314. Such a presumption is warranted only by circumstances posing "'a realistic likelihood of vindictiveness'" in "all cases of the type presented." *Id.* at 314–315 (quoting *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)); *see Ball*, 18 F.4th at 454–455. For example, a prosecutor's decision to bring more serious charges on retrial against a defendant who has successfully appealed his conviction and obtained a new trial is presumptively vindictive. *See Blackledge*, 417 U.S. at 28–29; *Ball*, 18 F.4th at 455. The government may rebut the presumption of vindictiveness with "objective information justifying the detrimental action." *Fiel*, 35 F.3d at 1007; *see Goodwin*, 457 U.S. at 374; *Wilson*, 262 F.3d at 315.

The presumption of vindictiveness "will rarely, if ever, be applied to prosecutors' pretrial decisions." *Wilson*, 262 F.3d at 315; *see Perry*, 335 F.3d at 324 ("[A] presumption of prosecutorial vindictiveness is generally warranted only in a post-conviction setting."). As the Supreme Court has explained, "a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision." *Goodwin*, 457 U.S. at 381. Before trial, the prosecutor's "assessment of the proper extent of prosecution may not have crystallized," *id.*, and the prosecutor retains "the freedom to reassess the case and bring new charges if they are warranted," *United States*

7

*v. Williams*, 47 F.3d 658, 664 (4th Cir. 1995); *see United States v. Doty*, 832 Fed. App. 174, 180 (4th Cir. 2020) ("Bringing new charges in a superseding indictment before trial fails to create a presumption of vindictiveness."). At the same time, defendants routinely file pretrial motions asserting rights associated with the suppression of evidence, the sufficiency and form of the indictment, affirmative defenses, requests for psychiatric services, discovery, and trial by jury. *See Goodwin*, 457 U.S. at 381. "It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter" a defendant. *Id.*

Villa argues that the prosecutor retaliated against him for successfully asserting his Fourth Amendment rights by charging him with aggravated reentry—an offense with a greater statutory maximum than the firearm charge in the first indictment—after the district court granted his motion to suppress the weapons. He lacks direct evidence of vindictiveness but urges us to apply a presumption of vindictiveness in all cases where a defendant receives a favorable suppression ruling and the prosecutor obtains a new or superseding indictment resulting in greater sentencing exposure.

We decline the invitation because these circumstances do not "pose a realistic likelihood of vindictiveness," *Wilson*, 262 F.3d at 315 (internal quotation marks omitted), sufficient to warrant "adopting an inflexible presumption," *Goodwin*, 457 U.S. at 381. After learning that Villa was an illegal alien and found in possession of eight firearms, the prosecutor initially charged him with unlawfully possessing those firearms (and ammunition). As the trial date approached, the prosecutor began collecting evidence to strengthen the case against Villa on the firearm charge, in particular to prove Villa's alien

8

status.  In the process of assisting the prosecutor, a federal agent learned that Villa had previously been removed from the United States and obtained records documenting Villa's removal after having committed two felonies.  Contemporaneously, the district court suppressed evidence in the firearm case that required dismissal of that charge and Villa's release if no additional charges were brought.  When the prosecutor learned Villa had committed a different offense that he could prove—aggravated reentry—the prosecutor promptly obtained an indictment charging that offense instead of facilitating Villa's release.

This is the kind of pretrial decisionmaking that the Supreme Court has cautioned counsels against a presumption of vindictiveness.  "An initial [charging] decision should not freeze future conduct" because "the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution."  *Goodwin*, 457 U.S. at 382; *see*, *e.g.*, *Bordenkircher v. Hayes*, 434 U.S. 357, 360 (1978).  As occurred here, "the prosecutor may uncover additional information that suggests a basis for further prosecution" while preparing for trial or "may come to realize" that information already possessed "has a broader significance."  *Goodwin*, 457 U.S. at 381.  Quite unlike the typical case in which a presumption of vindictiveness arises when a new charge is added after a successful appeal, these circumstances do not suggest that the prosecutor previously "deemed the [aggravated reentry] charge unworthy of prosecution" but then changed his mind solely in retaliation for Villa's exercise of his rights.  *Wilson*, 262 F.3d at 319.  Moreover, when a prosecutor adds a "new charge" based on "a new set of facts" after a pretrial suppression ruling forecloses prosecution on the initial charge, it "is at least as

9

likely, or even more likely," that the decision was based on an assessment that the defendant "pose[d] a threat to public safety." *Id.*

Villa's counterarguments are unpersuasive. Primarily, Villa urges us to follow *United States v. LaDeau*, 734 F.3d 561 (6th Cir. 2013), where the Sixth Circuit affirmed application of the presumption of vindictiveness to a pretrial charging decision. There, the government initially charged LaDeau with possessing child pornography. After the district court granted LaDeau's motion to suppress the evidence of possession, the government obtained a superseding indictment charging LaDeau with conspiracy based on the same conduct. But rather than charging LaDeau "with conspiring to *possess* child pornography, the government chose to charge him with conspiring to *receive* child pornography," a decision that doubled his sentencing exposure. *Id.* at 564. As the Sixth Circuit emphasized, the heightened charge in the superseding indictment was "based on the same conduct underlying the charge in the initial indictment," and "no new revelation or discovery" supported the government's shift to a receipt theory. *Id.* at 570–571.

Whatever the merits of *LaDeau*, Villa's is not a case where the prosecutor, in response to an adverse suppression ruling, obtained a more serious charge based on the *same conduct* that animated the original indictment. The *LaDeau* court itself considered this a material distinction. *See id.* at 570 (noting the potential for vindictiveness "only if" a superseding indictment adds or substitutes charges "based on the same conduct charged less heavily in the first indictment" (internal quotation marks omitted)); *see also United States v. Ribota*, 792 F.3d 837, 841 (7th Cir. 2015) ("Where a more severe charge is filed as to the same conduct, the possibility of vindictiveness is raised," but "the spectre of

10

vindictiveness is lacking where the challenged charge is independent of the one that formed the basis of the exercise of the legal right."). Here, the second indictment charged Villa for different conduct than the first. The government originally charged Villa with possessing firearms and ammunition as an illegal alien. *See* 18 U.S.C. § 922(g)(5). The second indictment charged Villa with reentering the United States after an aggravated felony conviction and removal. *See* 8 U.S.C. § 1326(a), (b)(2). Although both charges included Villa's unlawful presence in the United States as an element, they targeted different conduct—possession of firearms and ammunition in one and illegal reentry in the other.

And as the district court observed, the aggravated reentry charge was based on evidence the prosecutor did not have when making the initial charging decision. Not until after the magistrate judge recommended granting in part Villa's motion to suppress did the prosecutor learn that Villa, under a different name, had previously been removed from the country. We agree that this context presents a further reason to find no realistic likelihood of vindictiveness. *See United States v. Campbell*, 410 F.3d 456, 462 (8th Cir. 2005) ("There can be no prosecutorial vindictiveness if the prosecutor revised the charge because of newly discovered evidence or some objective reason other than to punish the defendant for exercising his legal rights.").

Villa responds that between the prosecutor and various federal agencies, "the government" collectively had all the information needed to discover his aggravated reentry, and the decision not to follow those leads earlier should raise a presumption of vindictiveness. But courts recognize that prosecutors (like defense attorneys) will

11

"uncover additional information" during their investigation and trial preparation or "may come to realize that information" they already possess "has a broader significance" than previously understood. *Goodwin*, 457 U.S. at 381. To find vindictiveness in these kinds of routine pretrial developments would be an ill fit with both Supreme Court precedent and our caselaw concerning vindictive-prosecution claims. And the construct of collective knowledge is out of place in a search for vindictiveness, which is a motive personal to the prosecutor who pursues the heightened charges. *See Wilson*, 262 F.3d at 314 (requiring evidence that "the prosecutor acted with genuine animus toward the defendant" or circumstances from which this motive may be presumed); *id.* at 320 (declining to "impute the improper motivation" from one prosecutor to another).

Villa has failed to demonstrate that the presumption of vindictiveness applies. The presumption of regularity that attends a prosecutor's pretrial charging decision therefore remains in place. *See Ball*, 18 F.4th at 454; *Wilson*, 262 F.3d at 315. We thus affirm the district court's judgment denying Villa's motion to dismiss the second indictment for prosecutorial vindictiveness.

III.

Next, Villa appeals the denial of his motion to dismiss the second indictment based on an alleged violation of his constitutional right to a speedy trial. The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. Because "[t]he speedy-trial right is amorphous, slippery, and necessarily relative," it is not defined by a fixed amount of time but instead is circumstance-dependent. *Vermont v. Brillon*, 556 U.S. 81, 89–90 (2009) (internal

12

quotation marks omitted).    Accordingly, we use a balancing test to evaluate Sixth Amendment speedy-trial claims, examining the "(1) the 'length of the delay'; (2) 'the reason for the delay'; (3) 'the defendant's assertion of his right'; and (4) the 'prejudice to the defendant.'"  *United States v. Robinson*, 55 F.4th 390, 399 (4th Cir. 2022) (quoting *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).    We review the district court's legal conclusions on this score de novo but defer to its fact finding absent clear error.  *See id.*; *United States v. Burgess*, 684 F.3d 445, 451 (4th Cir. 2012).

The length of the delay is both the balancing test's first factor and "a threshold requirement because the defendant must establish that the length of the delay is at least presumptively prejudicial" to trigger the balancing inquiry.  *Burgess*, 684 F.3d at 451; *see Doggett v. United States*, 505 U.S. 647, 651–652 (1992).  Courts generally have found a delay presumptively prejudicial "as it approaches one year," depending on the nature of the charges.  *Doggett*, 505 U.S. at 652 n.1; *see Burgess*, 684 F.3d at 452.

Measuring the length of the delay requires identifying when the speedy-trial clock begins to tick.  Consistent with Supreme Court precedent, we have said that "an 'arrest, indictment, or other official accusation'" triggers the Sixth Amendment's speedy-trial protection.  *Burgess*, 684 F.3d at 452 (quoting *United States v. Woolfolk*, 399 F.3d 590, 597 (4th Cir. 2005)); *see United States v. Marion*, 404 U.S. 307, 320 (1971).  And that right detaches when the government drops the charges in good faith, *United States v. MacDonald*, 456 U.S. 1, 7 (1982), or the accused is convicted, *Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016).

13

This case presents a related question we have not previously addressed: whether the speedy-trial clock begins anew if, after an initial arrest and indictment, the government later obtains a new indictment and dismisses the first, but the defendant remains in custody throughout. In such circumstances, does the time run from the initial arrest or from the second indictment? The question matters here because Villa asserts that the time between his arrest and trial—about nineteen months—is presumptively prejudicial, but he does not make the same argument about the time between his second indictment and trial—just shy of six months. On the record before us, we hold that Villa's right to a speedy trial on the crime charged in the second indictment attached when the prosecution obtained that indictment. It did not relate back to Villa's initial arrest for different crimes.

Although our sister circuits have not applied a uniform mode of analysis to this question, each of the various approaches attempts to guard against the same concern—namely, that the government will use new or superseding indictments, with new or modified charges arising from the same conduct as the initial arrest and indictment, to avoid the strictures of the Speedy Trial Clause. Thus, when charges in a later indictment merely build off the first indictment or the conduct underlying it, courts tend to calculate the length of pretrial delay from the arrest or first indictment.

For example, the First Circuit measures the delay from arrest if the new or superseding indictment involves charges "based on the same act or transaction" or part of the "common scheme or plan previously charged," and "the government could have, with diligence, brought the additional charge at the time of the prior accusation." *United States v. Handa*, 892 F.3d 95, 106–107 (1st Cir. 2018); *cf.* Fed. R. Crim. P. 8(a). Likewise, the

14

Second Circuit has declined to restart the speedy-trial period "where charges on a superseding indictment arise from the same conduct as the original indictment." *United States v. Black*, 918 F.3d 243, 259 (2d Cir. 2019). The Seventh Circuit has acknowledged that "the initial arrest may well" trigger the speedy-trial right "if the crimes for which a defendant is ultimately prosecuted really only gild the charge underlying his initial arrest and the different accusatorial dates between them are not reasonably explicable." *United States v. DeTienne*, 468 F.2d 151, 155 (7th Cir. 1972). A later charge runs afoul of this standard if it "merely annotates in more detail the same charge alleged in the initial accusatory instrument." *United States v. Bailey*, 111 F.3d 1229, 1236 (5th Cir. 1997). While the Fifth Circuit has relied on the Seventh Circuit's approach in constitutional cases, *see United States v. Nixon*, 634 F.2d 306, 309 (5th Cir. 1981), it has also applied the Supreme Court's double jeopardy test from *Blockburger v. United States*, 284 U.S. 299 (1932), to evaluate whether charges in a new or superseding indictment are sufficiently different to warrant restarting the clock, at least for purposes of the Speedy Trial Act. *See Bailey*, 111 F.3d at 1236; *see also Black*, 918 F.3d at 275–277 (Cote, J., dissenting) (applying *Blockburger* test to determine when Sixth Amendment speedy-trial right attaches).[3]

---

[3] Villa asserts that some courts do not consider a superseding indictment ever to have an effect on the speedy-trial clock. *See United States v. Black*, 830 F.3d 1099, 1112 (10th Cir. 2016); *United States v. Battis*, 589 F.3d 673, 679 n.5 (3d Cir. 2009); *United States v. Jeanetta*, 533 F.3d 651, 656 (8th Cir. 2008); *United States v. Oriedo*, 498 F.3d 593, 597–598 (7th Cir. 2007); *United States v. Milhim*, 702 F.2d 522, 525 (5th Cir. 1983). But there is no suggestion in these cases that the charges in the later indictments were for conduct unrelated to the charges in the initial indictments.

15

We are satisfied that the concern underlying these various doctrinal formulations is not present here. Villa's second indictment charged conduct unrelated to his arrest; therefore, the gamesmanship concerns that might counsel against restarting the speedy-trial clock are not implicated. Indeed, Villa's illegal reentry predated the traffic violations that triggered his initial stop, his marijuana possession, and his possession of firearms and ammunition. His aggravated reentry charge did not "arise from the same conduct as the original indictment" or a common scheme or plan. *Black*, 918 F.3d at 259; *see Handa*, 892 F.3d at 106. In no way could the aggravated reentry charge be said to have merely gilded or added detail to the Section 922(g) charge. *See DeTienne*, 468 F.2d at 155. Both charges required the government to prove different elements. *See Bailey*, 111 F.3d at 1236 (discussing the *Blockburger* test); *compare* 18 U.S.C. § 922(g)(5), *with* 8 U.S.C. § 1326(a), (b)(2). And the prosecutor did not even have the evidence necessary to support the aggravated reentry charge until more than a year after Villa's original indictment.

On the facts here, Villa's constitutional right to a speedy trial on the aggravated reentry charge attached when the government obtained the indictment charging him with that offense, the second indictment in this case. Because Villa does not argue that the time between the second indictment and his trial—just short of 6 months—is presumptively prejudicial, he has not met the threshold requirement for evaluating the remaining *Barker* factors. *See Doggett*, 505 U.S. at 651–652 (explaining the delay must be presumptively prejudicial "[s]imply to trigger a speedy trial analysis"). We therefore affirm the district court's denial of Villa's motion to dismiss the second indictment on Sixth Amendment grounds.

16

IV.

Villa also briefly argues that the delay between his arrest and the second indictment violated the Fifth Amendment's Due Process Clause. The district court denied Villa's motion to dismiss the indictment on this ground; we review the court's factual findings for clear error and legal conclusions de novo. *See United States v. Lopez*, 860 F.3d 201, 209 (4th Cir. 2017). When evaluating a claim that pre-indictment delay violated the Fifth Amendment, we ask (1) whether the defendant has demonstrated substantial actual prejudice and (2) whether, considering "the government's reasons for the delay," there has been a violation of "fundamental conceptions of justice or the community's sense of fair play and decency." *United States v. Uribe-Rios*, 558 F.3d 347, 358 (4th Cir. 2009) (internal quotation marks omitted); *see Lopez*, 860 F.3d at 213. Substantial actual prejudice requires a defendant to show not only that the prejudice was actual, as opposed to speculative, but also "that he was meaningfully impaired in his ability to defend against the [government's] charges to such an extent that the disposition of the criminal proceeding was likely affected." *Jones v. Angelone*, 94 F.3d 900, 907 (4th Cir. 1996).

Villa's claim falters for at least two reasons. First, there was no delay in bringing the second indictment once the prosecution learned it had probable cause to indict Villa for aggravated reentry. The grand jury returned the second indictment just four days after the prosecution obtained Villa's A-file, which was proof of his prior removal. And the prosecution reasonably sought the A-file as part of preparing for trial on the original firearm charge. Second, even assuming delay, Villa has failed to demonstrate substantial actual prejudice. He primarily contends that the government's delay impaired his ability

17

to appeal the district court's partial denial of his first suppression motion and to appeal his above-Guidelines sentence. As to the former, the government's decision to dismiss the first indictment after the district court's suppression ruling—not any pre-indictment delay—mooted Villa's ability to appeal that ruling. And as for the latter, any impact on Villa's opportunity to effectively appeal his relatively short sentence does not show he was "meaningfully impaired in his ability to defend against" the aggravated reentry charge. *Id*. Villa does not argue, for example, that the delay "resulted in the unavailability of any records, witnesses, or other evidence" supporting a defense he intended to make to the aggravated reentry charge. *Uribe-Rios*, 558 F.3d at 358. Thus, we affirm the district court's denial of Villa's motion to dismiss for pre-indictment delay.

V.

Finally, Villa appeals the district court's denial of his second motion to suppress, in which he sought to suppress his fingerprint records and the criminal and immigration records obtained thereby as the product of unlawful police activity. We review the district court's legal conclusions de novo and its fact finding for clear error, construing the evidence in the light most favorable to the prevailing party—here, the government. *See United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010).

When police violate the Fourth Amendment's prohibition on unreasonable searches and seizures, the government may be forbidden from using the improperly obtained evidence at trial. *See Herring v. United States*, 555 U.S. 135, 140–142 (2009) (explaining principles for determining when the exclusionary rule applies). "[E]vidence that is the indirect product of the illegal police activity" may also be suppressed as "'fruit of the

18

poisonous tree'" when it has been obtained "'by exploitation of that illegality . . . instead [of] by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

Courts have long considered fingerprinting one of "the accepted means of processing an arrestee into custody." *Maryland v. King*, 569 U.S. 435, 458 (2013). So when police fingerprint an individual after an unlawful arrest, the fingerprint records and evidence obtained with them "are not automatically suppressible simply because they would not have been obtained *but for* illegal police activity." *Oscar-Torres*, 507 F.3d at 230. Rather, the critical question is whether the evidence was obtained by exploiting the illegal police activity. *Id.*

We explained this distinction in *Oscar-Torres*, drawing on *Hayes v. Florida*, 470 U.S. 811 (1985), and *Davis v. Mississippi*, 394 U.S. 721 (1969), as examples of such exploitation. In those cases, "the police, without probable cause, detained and then fingerprinted a person they suspected had committed a certain crime" for the "clear investigative purpose" of using the fingerprints to tie the suspect to the crime. 507 F.3d at 230. We reasoned that "[w]hen police officers use an illegal arrest as an investigatory device in a criminal case for the purpose of obtaining fingerprints without a warrant or probable cause, then the fingerprints are inadmissible under the exclusionary rule as fruit of the illegal detention." *Id.* at 230–231 (internal quotation marks omitted). "But when fingerprints are administratively taken for the purpose of simply ascertaining the identity or immigration status of the person arrested, they are sufficiently unrelated to the unlawful

19

arrest that they are not suppressible." *Id.* at 231 (internal quotation marks and ellipses omitted).

These principles dictate the outcome here and easily support the district court's ruling. For starters, the standards outlined in *Oscar-Torres* presuppose an illegal detention. But here, deputies fingerprinted Villa after arresting him on probable cause for state drug law violations, and the United States Marshals fingerprinted him after the district court issued an arrest warrant based on the federal offenses alleged in the criminal complaint. Moreover, even assuming Villa's arrest violated the Fourth Amendment, officers did not "purposefully exploit[]" an unlawful arrest in order to obtain his fingerprints. *Id*. (internal quotation marks omitted). The district court found "no indication in the record that [Villa's] fingerprints were taken for investigative purposes, such as to compare them to unidentified prints taken from a crime scene" or "for any reason other than the normal, administrative booking process." *United States v. Villa*, 429 F. Supp. 3d 168, 173 (W.D.N.C. 2019). That finding is not clearly erroneous.

Villa misreads *Oscar-Torres*. He contends that suppression is required because his arrest and fingerprinting were part of a criminal prosecution, as opposed to an administrative deportation. That is not the line we drew in *Oscar-Torres*; indeed, a rule requiring automatic suppression of fingerprint evidence obtained after an unlawful arrest or detention in all criminal cases would directly contradict our decision. *See* 507 F.3d at 230. Rather, as previously explained, *Oscar-Torres* makes exploitation of unconstitutional tactics the relevant distinction. *See id.* at 231 (reasoning that suppression is warranted when police use unlawful means to "obtain[] the challenged fingerprints during

20

investigation of a specific crime, and through an investigative detention for investigative purposes related to that crime" (internal quotation marks omitted)). Nor is suppression warranted because the fingerprints were later revealed to have investigatory value to law enforcement. Again, under *Oscar-Torres*, the focus is on law enforcement's purpose for the illegal arrest and fingerprinting, not whether, looking retrospectively, officers obtained an investigatory benefit from an otherwise routine booking procedure. Villa has not shown that officers arrested and fingerprinted him for an investigative purpose; therefore, we affirm the district court's denial of his second suppression motion.

VI.

After careful review, we conclude that none of Villa's arguments merit vacatur of his conviction. The judgment of the district court is

<em>AFFIRMED</em>.